## Commonwealth vs. Arthur Rainwater.

Worcester. February 3, 1997. - July 24, 1997.

Present: Wilkins, C.J., Abrams, Lynch, O'Connor, Greaney, Fried, & Marshall, JJ.

*Constitutional Law,* Assistance of counsel, Admissions and confessions. *Practice, Criminal,* Assistance of counsel, Admissions and confessions. *Evidence,* Admissions and confessions.

Where a criminal defendant was arrested and arraigned and had counsel appointed to represent him on one charge and thereafter, while in custody, he was interrogated by police and made inculpatory statements with respect to other crimes, for which proceedings had not formally been initiated, after voluntarily and intelligently waiving his Miranda rights, those statements were not taken in violation of his State or Federal privileges against self-incrimination or right to counsel and were admissible at the trial of subsequent indictments for those other crimes, where the other crimes were not "inextricably intertwined" with the charge that was pending. [543-558] Marshall, J., dissenting, with whom Wilkins, C.J. & Abrams, J., joined.

Indictments found and returned in the Superior Court Department on January 14, 1993.

A pretrial motion to suppress evidence was heard by *Herbert F. Travers, Jr.,* J., and the cases were heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul J. McManus,* Committee for Public Counsel Services, for the defendant.

*Kennera M. McSherry,* Assistant District Attorney, for the Commonwealth.

Fried, J. The defendant was found guilty at a jury-waived trial on six indictments charging operation of a motor vehicle without the authority of the owner. He moved to suppress statements he had made to the police while being held following his arraignment on another charge, on the ground that these statements were taken in violation of his State and Federal constitutional rights. The motion was denied and the statements

admitted. The defendant appealed and we transferred the case to this court on our own motion. We affirm.

I

The defendant, nineteen year old Arthur Rainwater, was arrested in Worcester on September 10, 1992, when he attempted to flee from a stolen Toyota Corolla automobile in which he had been a passenger. Later that day, Rainwater was brought to a District Court and arraigned. Counsel was appointed to represent Rainwater, pursuant to his request at the arraignment. Counsel held a brief conversation with Rainwater, informing him that he had a constitutional right to remain silent and instructing him not to talk to anyone else. After the bail hearing, Rainwater was taken to the Worcester County house of correction because he was unable to post bail.[1] Having learned of Rainwater's arrest, Officer James O'Rourke of the Worcester police department's "auto theft squad" telephoned the officers at the house of correction and asked that he be allowed to question Rainwater. O'Rourke had questioned Rainwater on a separate charge the previous year and Rainwater had not shown any reluctance to cooperate on that occasion.

O'Rourke was investigating a rash of thefts in the city, particularly thefts in which the thieves left various taunting messages on the vehicles they had stolen and later abandoned. Several stolen autos were also emblazoned with numbers, apparently signifying the sequence in which they had been stolen. Because Rainwater had been arraigned for the theft of the Toyota earlier that day, O'Rourke knew the defendant was or was likely to be represented by counsel appointed for him at that arraignment. When O'Rourke arrived at the house of correction that evening, Rainwater was brought to meet him in a conference room. O'Rourke proceeded to show him a card on which the standard Miranda warnings were printed and to read these warnings to him as well. Rainwater signed the card. O'Rourke then asked Rainwater about some one hundred unsolved thefts. Rainwater readily acknowledged involvement

---

[1] At the suppression hearing, Rainwater's arraignment attorney testified that Rainwater had been "whisked off" to the house of correction. She did not, however, suggest — nor is there any evidence — that she had then or at any time since been prevented from communicating with her client for as long as she desired.

in several, including the theft for which he had been arraigned that day. After Rainwater made these admissions, O'Rourke asked if he would testify against the other two individuals involved in the thefts, stating that he would bring Rainwater's cooperation to the attention of the district attorney. Rainwater said he would not testify for the prosecution.

The interrogation lasted about one hour. Two or three days later, O'Rourke returned briefly to the house of correction to meet with Rainwater. At this meeting O'Rourke repeated the Miranda warnings and asked Rainwater if he understood them. When Rainwater said he did, O'Rourke showed him a written report of the September 10 interview and asked Rainwater to sign each page, which he proceeded to do. The motion judge found that O'Rourke had not questioned Rainwater about the Toyota theft at the September 10 meeting. That is incorrect. This theft, for which Rainwater had been arraigned, did enter the conversation because O'Rourke's written report of the interrogation lists this theft among the others in which Rainwater admitted involvement. As a result, we agree with Rainwater that the motion judge's subsequent finding that there had been no reference to or discussion of that theft during the interrogation was clearly erroneous, and we consider the case on that basis.

Rainwater pleaded guilty to the September 10 theft of the Toyota. This appeal concerns the string of earlier thefts, to which Rainwater admitted involvement in his oral and written statements to O'Rourke. Rainwater sought to have these statements suppressed prior to his trial on these other charges. At the suppression hearing he asserted a violation of his rights under the Fifth and Sixth Amendments to the United States Constitution and under art. 12 of the Massachusetts Declaration of Rights. That is, Rainwater claimed to have suffered both a violation of the privilege against self-incrimination as implemented by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and its progeny; and of the right to counsel as clarified in *Massiah* v. *United States*, 377 U.S. 201 (1964). The motion judge does not appear to have considered these to be distinct claims, but rather ruled that the statements were admissible, because Rainwater had been clearly apprised of his Miranda rights, had freely consented to questioning, had not requested a lawyer during the questioning, and had made the statements freely and intelligently. These statements were admitted at the jury-waived trial on the charges prior to September 10, including that portion of the statements

which described his involvement in the September 10 theft of the Toyota, to which he had already pleaded guilty.

In this appeal Rainwater renews the same constitutional claims he raised earlier. He argues that his request for counsel at the time of arraignment operates as a request for counsel similar to that under the rule in *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981), which held that once an accused has invoked his right to counsel under the *Miranda* case, there can be no further questioning, unless the accused himself initiates such communication. Rainwater goes on to argue that once the right to counsel attached at his September 10 arraignment, any further questioning out of the presence of counsel violated his Sixth Amendment right to the assistance of counsel. Finally he argues that, even if the Federal Constitution extends this right only to the offense for which proceedings had been formally initiated, this court should adopt a more expansive view of the right to counsel under art. 12.

## II

### A

As to the questioning at issue, the defendant was provided with the standard Miranda warnings at the outset, the questioning was calm and straightforward, and the motion judge's conclusion that the defendant's statement was given freely was entirely warranted.[2] The issue in this case is the propriety of such questioning after a defendant has been arraigned and

---

[2]At the suppression hearing Rainwater testified that O'Rourke told him that he had come to talk about stolen automobiles and explained his rights to him at the outset. Rainwater testified that he could not recall O'Rourke's saying anything about a lawyer, but testified that he had asked O'Rourke, "Shouldn't my lawyer be here?," to which O'Rourke replied, "If you sign this paper [she] won't need to be." In contrast, O'Rourke testified that he began by reading a Miranda card to Rainwater and asking him to sign it. The card, which was admitted in evidence, clearly includes the standard notice that the defendant had a right to have a lawyer present. O'Rourke was not asked either on direct examination or on cross-examination about the statement Rainwater attributed to him and the motion judge's finding on this point states only that "[a]t the commencement of their conversation [O'Rourke] advised the defendant of his Miranda rights. He showed him the Miranda card. The defendant indicated that he understood his rights, and he signed the card." While the motion judge did not refer specifically to the exchange reported in Rainwater's testimony, and was not required to do so, the judge did find that "the defendant at no time requested to have a lawyer and at no time indicated

counsel appointed. The law regarding this aspect of police questioning of persons charged with crime is entirely clear.[3] Once a person has been formally charged, as at an arraignment, the Sixth Amendment right to counsel attaches, *Massiah* v. *United States*, 377 U.S. 201, 206 (1964), and the police may not question a person so charged, who is represented or has sought representation, *Michigan* v. *Jackson*, 475 U.S. 625, 632-635 (1986), without the consent of counsel. This prohibition is "offense specific." *McNeil* v. *Wisconsin*, 501 U.S. 171, 175 (1991). In speaking for the Court in the first case to focus on this aspect of the *Massiah* rule, *Maine* v. *Moulton*, 474 U.S. 159, 180 n.16 (1985), Justice Brennan stated the rule: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." Nor did this statement stand in isolation. Instead, it is intrinsic to the Court's discussion of the principles and policies that had guided the development of this aspect of the right to counsel, and represented what *Moulton, supra* at 179-180, described as a sensible solution to a difficult problem:

"The police have an interest in the thorough investigation of crimes for which formal charges have already been

that he did not wish to speak to the officer." If the motion judge specifically found that an interchange such as the one Rainwater alleges had taken place, we would not be so ready to say that the defendant's Fifth Amendment rights articulated in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), had been fully accorded, since police officers have no business giving what an unsophisticated person might consider advice that he does not need to have a lawyer. They must remain entirely neutral on the subject.

Contrary to the suggestion in the dissent, the motion judge's finding on this point is quite sufficient. *Post* at 562-563. There is no requirement that there be a specific finding as to each item of unsupported testimony, but only as to the legal contention — here an implied request for counsel — on which such testimony might bear. Our review does not take us behind such findings to require findings on the truth vel non of particular items of testimony that bear on the relevant legal contention. We see no reason to embark on such a practice here.

[3]Rainwater seeks to make something of the fact that, although he may have consented to questioning after receiving the Miranda warnings, he had not consented to the meeting with O'Rourke in the conference room at the house of correction. We fail to see any relevance in this fact, and certainly decline to add to the familiar and workable rules governing this area a new rule of uncertain scope which would require a defendant's consent before he is brought into the presence of those who will question him. The defendant offers no authority to support this proposal.

filed. They also have an interest in investigating new or additional crimes. . . . In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. . . . On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements *pertaining to pending charges* are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel" (emphasis supplied).

The Court revisited this issue in *McNeil* v. *Wisconsin*, 501 U.S. 171, 175-176 (1991), and strongly reaffirmed the principles and conclusions of *Moulton*. It noted that any departure from the "offense specific" nature of the Sixth Amendment right would have the unacceptable entailment that "most persons in pretrial custody for serious offenses would be *unapproachable* by police officers suspecting them of involvement in other crimes, *even though they have never expressed any unwillingness to be questioned*" (emphasis in original). *Id.* at 181.[4]

The defendant argues that this rule is incompatible with *Ed-*

[4]The defendant quotes *Michigan* v. *Jackson*, 475 U.S. 625 (1986), to support the contentions he now raises. But it cannot support this weight. *Jackson* decided two companion cases. In one the defendant Bladel had been charged and arraigned for a triple murder. Counsel was appointed but was unavailable to consult with Bladel for several days. During the interim, the police obtained a confession from Bladel, who was in custody, after he waived his Miranda rights. In the other case the defendant Jackson was suspected of complicity in a murder. Arrested on an unrelated charge, he made a series of incriminating statements relating to the murder prior to his arraignment at which he requested counsel. The following morning, before Jackson was able to consult with counsel the police obtained a Miranda waiver and another statement. The sole issue the Court considered was whether the *Edwards* rule extended to the Sixth Amendment insofar as a subsequent Miranda waiver by the accused might validly waive the Sixth Amendment right to counsel that had attached at arraignment. The Court held that the Miranda waiver was not effective to

*wards* v. *Arizona*, 451 U.S. 477 (1981), which held that once a person subjected to custodial interrogation invokes the right to counsel pursuant to his Miranda warnings, all interrogation must stop until counsel is provided and any further uncounselled interrogation violates the Fifth Amendment. The *Edwards* rule quite plainly is not offense specific. The defendant argues that the request for counsel at arraignment is the equivalent of a request for counsel pursuant to *Miranda*, so that any custodial questioning after arraignment violates the Fifth Amendment. As a corollary to this proposition, the defendant argues that any questioning after arraignment must also violate the right to counsel under the Sixth Amendment. The Court in *McNeil* v. *Wisconsin, supra* at 177, explicitly rejected that very argument:

> "Having described the nature and effects of both the Sixth Amendment right to counsel and the *Miranda-Edwards* 'Fifth Amendment' right to counsel, we come at last to the issue here: Petitioner seeks to prevail by combining the two of them. He contends that, although he expressly waived his *Miranda* right to counsel on every occasion he was interrogated, those waivers were the invalid product of impermissible approaches, because his prior invocation of the offense-specific Sixth Amendment right . . . was also an invocation of the nonoffense-specific *Miranda-Edwards* right. We think that is false as a matter of fact and inadvisable (if even permissible) as a contrary-to-fact presumption of policy."

### B

The defendant seeks to escape the clear import of this rule by asserting a close connection between the September 10 theft, for which he had been charged and arraigned, and the other thefts which were the subject of this trial. He also notes — and

do that. But there was no consideration of the offense specific nature of the Sixth Amendment as announced in *Maine* v. *Moulton*, 474 U.S. 159 (1985), which had been decided less than four months earlier. Indeed, that issue was so far from the Court's mind that it did not notice that its own statement of the facts, *Jackson, supra* at 628, failed to clarify whether Jackson's arraignment was based on the murder or the unrelated charges. (The briefs before the Court, however, make it clear that the arraignment took place on the murder charge.) In *McNeil* v. *Wisconsin*, 501 U.S. 171, 179 (1991), the Court stated that its conclusion did not contradict *Jackson*, "it *rests* upon it" (emphasis in original).

the Commonwealth concedes — that O'Rourke violated the defendant's Sixth Amendment rights under *Massiah* by mentioning the September 10 theft in his questioning and by eliciting an admission in respect to that theft which was contained in the written report that was admitted as an exhibit and discussed in this trial.

As to the first point, the defendant suggests a degree of turmoil and uncertainty in the case law that we do not detect. In *People* v. *Clankie*, 124 Ill. 2d 456, 463-464 (1988), the court noted that the Supreme Court in *Brewer* v. *Williams*, 430 U.S. 387 (1977) (defendant indicted for abduction admitted during uncounselled questioning that he had killed the victim of that abduction), "has . . . apparently assumed that sixth amendment rights . . . extend to offenses closely related to [the formally charged] offense . . . even if . . . the two offenses must be *extremely* closely related, the required relationship exists in this case" (emphasis in original). In *People* v. *Clankie, supra*, the postcharge statements dealt with the same residential burglaries which were the subject of the charges already entered. In *United States* v. *Hines*, 963 F.2d 255, 257 (9th Cir. 1992), the court recognized "[a]n exception to the offense-specific requirement of the Sixth Amendment [right to counsel] . . . when the pending charge is so inextricably intertwined with the charge under investigation that [it] cannot constitutionally be isolated from . . . the uncharged offense." Accord *United States* v. *Cooper*, 949 F.2d 737 (5th Cir. 1991), cert. denied, 504 U.S. 975 (1992) (uncharged Federal offense of unlawful possession of registered firearm not inextricably intertwined with pending State charge of armed robbery involving the same weapon).[5]

Under this standard, the auto thefts which are the subject of

[5]A number of courts have examined this "closely related" argument before and recognized that the right to counsel may apply to offenses that have not yet been charged. In examining the scope of this exception, courts seem to use the terms "inextricably intertwined," *United States* v. *Hines*, 963 F.2d 255, 257 (9th Cir. 1992), "extremely closely related," *United States* v. *Carpenter*, 963 F.2d 736, 740 (5th Cir.), cert. denied, 506 U.S. 927 (1992), and "closely related," *United States* v. *Kidd*, 12 F.3d 30, 33 (4th Cir. 1993), interchangeably without intending any divergence in meaning. See *United States* v. *Arnold*, 106 F.3d 37, 40-41 (3d Cir. 1997); *Whittlesey* v. *State*, 340 Md. 30, 53-54 (1995), cert. denied, 516 U.S. 1148 (1996). The United States Court of Appeals for the Third Circuit in *Arnold, supra* at 41, and the Court of Appeals of Maryland in *Whittlesey, supra* at 54, have noted that two lines of case law have developed under this exception. The first line of cases construes the phrase "closely related" more broadly where there is evidence that the police

this appeal were not inextricably intertwined with the September 10 theft with which the defendant had already been charged at the time of the questioning. Nor were they closely related in the relevant sense. While it is true that all of the thefts were committed by the same three individuals, and all of the *uncharged* thefts evidenced a desire to taunt the police and display larcenous prowess, each theft was a separate offense that could and would have to be proved separately.[6] The defendant claims that the cases were intertwined because he and his cohorts used a similar method of operation, with particular reference to their penchant for defacing the stolen vehicles with slogans and numbers. We fail to see why these similarities intertwine the charged offense inextricably with the uncharged offenses now before the court. In the charged September 10 theft there is no evidence that the threesome had proceeded to the point of affixing their signature graffiti to the Toyota. They had just stolen it

deliberately sought to circumvent the prohibition on questioning *in respect to the charged offense*. In this case the reference to the charged offense was incidental at most and, as we explain, O'Rourke could have had no reason to seek further evidence as to that offense as Rainwater had already agreed to plead guilty and it had been agreed that a suspended sentence would be recommended. *United States* v. *Arnold, supra* at 41, citing *United States* v. *Martinez*, 972 F.2d 1100 (9th Cir. 1992) (court remanded case to determine whether State prosecutors deliberately dropped charges against accused to facilitate a Federal investigation of the same topic); *United States* v. *Mitcheltree*, 940 F.2d 1329, 1342-1343 (10th Cir. 1991) (government exploited contact between defendant and government informant to obtain evidence for charged offense and this interaction was used as the basis for a witness tampering prosecution). The second, and more extensive line of cases, focuses "entirely on whether the facts underlying the charged and uncharged offenses are either 'closely related' or 'inextricably intertwined,'; two terms which we take to mean the same thing." *United States* v. *Arnold, supra*. However defined, this exception has been applied in an extremely limited manner, as while many cases have discussed its purpose and scope and recognized the existence of such an exception, very few have found occasion to apply it. See *Whittlesey* v. *State, supra* at 51, and cases cited. Noting that this is a narrow exception, we adopt the "inextricably intertwined" language, although we, like other courts, recognize that this same test is denoted by various other labels.

[6]In noting that these thefts were separate offenses that could and would have to be proved separately, we propose no other test than that in general use among the State and Federal courts, the "inextricably intertwined" test. See note 5, *supra*, and Section IV below. That being said, if the uncounselled and counselled offenses cannot be proved separately, then surely there has been a constitutional violation. Thus, the phrase referred to by the dissent may conveniently serve as a sufficient though not a necessary condition for a violation.

and were caught as they were driving it away. At most, the evidence indicates that they had effected entry into all the vehicles by means of a screw driver or dent puller — hardly a distinctive method of operation in auto thefts.[7]

[7]The dissent takes a different position and claims that the September 10 theft and the prior thefts involved "events closely surrounding the charged crime," creating a sufficiently "close relationship," that O'Rourke's questioning as to Rainwater's involvement in other auto thefts, apart from the September 10 offense, raised "a substantial issue whether [Rainwater's] right to counsel . . . carried over to the uncharged remaining offenses." To support this position, the dissent notes that the thefts "occurred within days of each other," over the course of two weeks; that they "took place within the same section of Worcester"; and that they involved an identical modus operandi. *Post* at 563. These similarities are enough to tie the crimes together, the dissent claims, because "courts have looked for similarities of time, place, person and conduct," quoting *United States* v. *Arnold*, 106 F.3d 37, 41 (3d Cir. 1997), to determine the scope of a defendant's Sixth Amendment protections. *Post* at 563. We do not read the cases this way.

Of the five cases which the dissent cites in support of this position, only *Arnold* speaks of *"similarities* of time, place, person and conduct" (emphasis supplied). *Id.* In contrast, *Whittlesey* v. *State*, 340 Md. 30, 55 (1995), states that "[t]o determine whether the same acts underlie both charges, courts have looked for *identity* of time, place and conduct," citing *United States* v. *Kidd*, 12 F.3d 30, 33 (4th Cir. 1993). See *Hendricks* v. *Vasquez*, 974 F.2d 1099, 1104-1105 (9th Cir. 1992), cert. denied sub nom. *Hendricks* v. *Calderon*, 116 S. Ct. 1335 (1996); *United States* v. *Carpenter*, 963 F.2d 736, 741 (5th Cir. 1992); *United States* v. *Hines*, 963 F.2d 255, 257 (9th Cir. 1992). Indeed, in *United States* v. *Kidd, supra,* the court said that, "[i]n order to fall within [the 'related offense'] exception, the offense being investigated must derive from *the same factual predicate* as the charged offense." Determining that a post-indictment drug transaction was not closely related to a number of drug transactions on which the defendant had previously been charged, the court observed that, although the latter transaction "involved the same type of crime as the charged offenses, it involved a different purchaser-informant, occurred at a different time, and took place in a different location," thus making it "factually distinct from, and independent of, the prior distribution offenses for which the Sixth Amendment right had been invoked." *Id.* See *People* v. *Spivey*, 245 Ill. App. 3d 1018, 1021-1022 (1993) (similar criminal acts, occurring in same location but at different times with different victims, were not "extremely closely related"). Furthermore, while *Arnold* speaks once of "similarities," it states that these factors are used to determine "whether the *same* acts and factual predicates underlie both the pending and the new charges," *United States* v. *Arnold, supra* at 41, and does not appear to deviate from the narrow reading given this test by other courts. Indeed, it is instructive to note that, while all five cases cited by the dissent note and discuss the "closely related" doctrine, only *Arnold* finds reason to apply it and does so stating that both offenses at issue, that charged (witness intimidation) and that uncharged (attempted murder of a witness), "arose from the *same* predicate facts, conduct,

The Commonwealth concedes that, contrary to the motion judge's finding, O'Rourke brought up the charged September 10 offense in questioning Rainwater and that an admission in respect to that offense was included in the written statement admitted at trial. Had that portion of the statement been brought up at a trial for that September 10 theft, there is no doubt that this would constitute constitutional error such as could only be excused if shown to be harmless beyond a reasonable doubt. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 635 (1994); *Commonwealth* v. *Perez*, 411 Mass. 249, 260 (1991). Nor would the Commonwealth be able to excuse this violation on the ground that the subject came up in the course of a good faith inquiry into the separate uncharged crimes, for the fact that the police may in all good faith be investigating another crime does not absolve them from their constitutional duty to stay clear of any inquiry into a crime in which the right to counsel has attached. See *Maine* v. *Moulton, supra* at 171 (State has "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel"). Accord *United States* v. *Terzado-Madruga*, 897 F.2d 1099, 1109 (11th Cir. 1990). Indeed that is the proposition that was in controversy between the majority and the dissent in *Moulton*, *supra* at 188-189 (Burger, C.J., dissenting).

But in this case the statement was not admitted against Rainwater in a trial for the charged offense. He had been caught red-handed in the case of the September 10 theft and pleaded guilty to that offense. It might, therefore, be suggested that allowing the admission of the statement in a trial for the uncharged offenses was perfectly proper. The defendant responds by arguing that the questioning having been improper, any use of its fruits is also improper, even if those fruits are served up in a trial for another offense. The defendant directs us to *United States* v. *Mitcheltree*, 940 F.2d 1329, 1342-1343 (10th Cir. 1991), and *United States* v. *Terzado-Madruga*, *supra* at 1112-1113, for this proposition. While both cases recite the applicability of the fruit of the poisonous tree doctrine, both courts *allowed* the admission of the contested evidence, despite blatant

intent and circumstances." *Id.* at 42. See *post* at 563. All thefts at issue in this case occurred at different times, involved different victims, and took place in different locations, although within a small geographic area. The only true identity tying these crimes together would be the unique vandalism. As noted in the text, however, the charged offense involved no such vandalism to tie it to the uncharged offenses.

violations of the defendant's Sixth Amendment rights in which the government made surreptitious recordings of conversations in which it utilized informants to construct situations that were certain to elicit incriminating statements regarding charged offenses where the right to counsel had already attached. See *United States* v. *Mitcheltree, supra* at 1337-1341; *United States* v. *Terzado-Madruga, supra* at 1109-1110. In stark contrast, Rainwater was not tricked into admitting his involvement in other uncharged car thefts. He was aware he was being questioned by a government agent and understood the purpose of O'Rourke's questioning. The statement about the September 10 theft was brief and insignificant relative to Rainwater's admissions to the earlier thefts for which he was subsequently tried. It supplied no missing element in the proof of those other crimes which are before us now. If the judge in this jury-waived trial credited O'Rourke's report of Rainwater's statement about the offenses in issue here at all, it would have been sufficient to justify the findings of guilt and the mention of the September 10 offense would have added nothing. Thus, even if error, its introduction into evidence here was harmless beyond a reasonable doubt.

Similar considerations dispose of the defendant's claim that O'Rourke engaged in improper attempts to plea bargain with a represented accused in the absence of his lawyer. In his testimony at the suppression hearing Rainwater said, "Before . . . talking about the car charges," O'Rourke told him, "That if I cooperated, that he could probably get me probation," and that "maybe he could talk to the [district attorney], see if I could get probation." O'Rourke testified that "[a]t the end of the interview," presumably after he had described the various thefts about which O'Rourke questioned him, O'Rourke asked Rainwater whether he would testify against his fellow thieves and said that he would mention Rainwater's cooperation to the district attorney. He told Rainwater that, "if the [district attorney] had a lesser sentence for him, since he had cooperated, that I would have no objections to it." When Rainwater's counsel questioned whether these remarks "would also apply [to] the September 10th offense that he was held on," O'Rourke replied that he "didn't say anything about the September 10th offense," but neither had he specifically excluded it from the offer. O'Rourke was quite clear that these remarks regarding possible leniency came after he had asked Rainwater to testify

against his friends and Rainwater had declined, which is after Rainwater had made his damaging admissions. The judge's findings were consistent with O'Rourke's testimony and placed this discussion at "the conclusion of the conversation with the defendant."

Certainly it is wrong for a police officer to attempt to plea bargain with a person formally charged with that very crime in the absence of his lawyer, *Commonwealth* v. *Manning*, 373 Mass. 438, 443 n.6 (1977), but when a police officer's inquiries and remarks of the sort involved here do not extend to charged offenses, they do not fall under that prohibition. Here the offers — or hints of offers — may not have specifically excluded the September 10 charged offense. In a situation like this, the investigating officer should take pains to make it clear he is not discussing the charged offense, just as he should with any line of questioning he pursues. But in this specific instance, as with the questioning, any error was harmless. Rainwater had been caught red-handed in the case of the charged offense and pleaded guilty to it. That offense is not now before the court. The most one could claim of Rainwater's statements regarding the earlier thefts, which are the subject of this appeal, is that their elicitation may have been partially induced by the suggestion of leniency Rainwater might have attributed to the charged offense as well as the uncharged offenses. But this is far fetched. O'Rourke testified that the possibility of leniency was only discussed at the end of the conversation, after Rainwater had already made the statements disputed here. Finally and most conclusively, in an affidavit submitted in support of his motion to suppress, Rainwater states: "During the questioning by Officer O'Rourke [September 10] I was advised that a disposition which [the lawyer appointed at arraignment] had negotiated in this case would not be adversely affected by my cooperation with the police. This disposition involved a guilty plea and suspended sentence as part of a joint recommendation by the District Attorney and [his lawyer]." Although the Commonwealth neglects to make any mention of this important admission, because Rainwater acknowledges in this affidavit that he was aware that his lawyer had already agreed on a plea and on the joint recommendation of a suspended sentence for the September 10 theft, which would not be affected by his sub- sequent cooperation in responding to O'Rourke's questions, there is simply no basis for claiming that O'Rourke's allusion to the

September 10 charge — or the failure explicitly to exclude it from the discussion — prejudicially induced Rainwater to admit to the earlier thefts which are at issue here.[8]

## III

As a final argument, the defendant invites us to find a violation of art. 12, even if we conclude that O'Rourke's questions regarding the uncharged offenses did not violate the Constitution of the United States. The dissent also rests its conclusion on art. 12. Article 12 provides that "every subject shall have a right to . . . be fully heard in his defence by himself, or his counsel, at his election." We have long interpreted that text generously to recognize the "fundamental . . . right of a person accused of a serious crime to have the aid and advice of counsel." *Guerin* v. *Commonwealth*, 339 Mass. 731, 734 (1959). And we have drawn on our own judgment and experience to grant more expansive protections under art. 12 than have been required of States under the Sixth Amendment. Thus in *Commonwealth* v. *Hodge*, 386 Mass. 165, 169 (1982), a case discussing a defendant's right to be represented by counsel who is not burdened by divided loyalties caused by a conflict of interest, we stated: "The Massachusetts Declaration of Rights can, and in this case does, provide greater safeguards than the Bill of Rights of the United States Constitution. We have repeatedly held that the right to be assisted effectively by counsel is independently guaranteed by art. 12." Under the Sixth Amendment, the Supreme Court had held that a defendant must show some actual prejudice arising from the conflict which adversely affected his lawyer's performance before he could claim a denial of the right to counsel. *Cuyler* v. *Sullivan*, 446 U.S. 335, 348 (1980). It was our view, however, that:

" 'the defendant is not to be put to the burden, perhaps insuperable, of probing the resolve and the possible mental conflict of counsel. . . .' [T]he right to effective assistance of counsel is fundamental. Such a fundamental right should not depend upon a defendant's ability to meet such an impossible burden, and so we hold that, having established a genuine conflict of interest, [the defendant] was required

[8]Actual sentencing for the September 10, 1992, offense took place over a year later on November 23, 1993, after Rainwater pleaded guilty on September 13, 1993, and a sentence of two years in a house of correction to run concurrently with another sentence was imposed at this time.

to prove neither actual prejudice nor adverse effect on his trial counsel's performance to entitle him to a new trial under art. 12."

*Commonwealth* v. *Hodge, supra* at 169-170, quoting *Commonwealth* v. *Cobb*, 379 Mass. 456, 461, vacated sub nom. *Massachusetts* v. *Hurley*, 449 U.S. 809 (1980), appeal dismissed, 382 Mass. 690 (1981).

Similarly, this court and the bar of the Commonwealth have historically taken measures to assure persons charged with crime the benefits of legal representation. Thus the Supreme Judicial Court adopted a rule which required the appointment of counsel in all noncaptial felony cases in 1958, five years before *Gideon* v. *Wainwright*, 372 U.S. 335 (1963), imposed this obligation on the States. See Rule 10 of the General Rules, 337 Mass. 813 (1958) (now S.J.C. Rule 3:10, as appearing in 416 Mass. 1306 [1993]). In 1964, this right was expanded to encompass indigent defendants who were charged with any crime which might result in imprisonment, Rule 10 of the General Rules, as appearing in 347 Mass. 809 (1964), several years before the Supreme Court declared the same right under the Federal Constitution. *Argersinger* v. *Hamlin*, 407 U.S. 25, 37 (1972). See Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution, 14 Suffolk U. L. Rev. 887, 888-889 n.7 (1980). And as notable as have been this court's efforts in this area, the efforts of the bar in responding to this mandate for many years on a largely pro bono basis have been even more so.

The extension of the right to counsel the defendant asks for here is, however, of a different order. We are asked here not to do better what we acknowledge the bar and legal system should already be doing, but to undertake a new departure which, in Justice Brennan's words, would "unnecessarily frustrate the public's interest in the investigation of criminal activity." *Maine* v. *Moulton*, 474 U.S. 159, 180 (1985). In the cognate area of rights under the *Miranda* decision and its progeny, we have been content to interpret art. 12 as the Supreme Court has interpreted the Fifth Amendment, just as we have in respect to the right to counsel under *Massiah* v. *United States*, which is in issue here. We discern no sufficient reason to depart from the balance the Supreme Court has struck between the interests of defendants and interests of the public in *Maine* v. *Moulton, su-*

*pra*, and *McNeil* v. *Wisconsin*, 501 U.S. 171 (1991). Such a departure from precedent may not only have unforeseen consequences for law enforcement but it would be unwarranted by any precedent either in our own jurisprudence and traditions or in those of any of our sister States.

The closest analogy the defendant asserts comes from civil matters in which counsel is prohibited from communicating with a represented person; however, that analogy supports the balance struck in the *Moulton* and *McNeil* cases. Supreme Judicial Court Rule 3:07, Canon 7, 7-104 (A) (1), as appearing in 382 Mass. 786 (1981), forbids an attorney from approaching an adversary when he knows that adverse party is represented by counsel. Even assuming the disciplinary rules are an appropriate analogy in this case where the defendant's proposed rule would control not the conduct of attorneys but of police officers, it is striking that this rule is likewise offense specific as it only prohibits an attorney from "communicat[ing] on the subject of the representation with a party he knows to be represented by a lawyer *in that matter*," and does not prevent communication concerning matters in which the adverse party is not represented (emphasis supplied).[9]

Finally, we are aware of no jurisdiction which has adopted a different approach. The courts which have considered this question have explicitly chosen to follow the same offense-specific rule which we adhere to today. See, e.g., *Hendricks* v. *Vasquez*, 974 F.2d 1099 (9th Cir. 1992), cert. denied sub nom. *Hendricks* v. *Calderon*, 116 S. Ct. 1335 (1996); *Carr* v. *State*, 840 P.2d 1000, 1005 (Alaska Ct. App. 1992); *State* v. *Richmond*, 114 Ariz. 186, 190-191 (1976), cert. denied, 433 U.S. 915 (1977); *Rutledge* v. *State*, 263 Ark. 781, 784 (1978); *People* v. *Clair*, 2 Cal. 4th 629, 658 (1992), cert. denied, 506 U.S. 1063 (1993); *State* v. *Birch*, 219 Conn. 743, 750-751 (1991); *People* v. *Watson*, 223 Ill. App. 3d 143, 146 (1991); *State* v. *Norris*, 244 Kan. 326, 332-333 (1989); *People* v. *Crusoe*, 433 Mich. 666, 697 (1989); *State* v. *Sparklin*, 296 Or. 85, 94-95 (1983); *State* v. *Sahlie*, 277 N.W.2d 591, 595-596 (S.D. 1979); *Shepperson* v. *Commonwealth*, 19 Va. App. 586, 590-591 (1995); *State* v. *Stewart*, 113 Wash. 2d 462, 473-479 (1989), cert. denied, 494

---

[9]Rule 4.2 of the Massachusetts Rules of Professional Conduct, which addresses communications with persons represented by counsel, is, if anything, more specific. Comment 1 states that the rule "does not prohibit communication with a represented person . . . concerning matters outside the representation . . . regarding a separate matter."

U.S. 1020 (1990); *State* v. *Clawson,* 165 W. Va. 588, 601-604 (1980). At one time New York adopted a different approach, but New York too has chosen to utilize the offense-specific rule followed elsewhere. See *People* v. *Bing,* 76 N.Y.2d 331, 341-350 (1990) (overruling previous holding which prohibited police from questioning defendants, not only on pending charges but on other unrelated matters as well).[10]

Without support in text, tradition, or analogy, and unguided even by experience in sister jurisdictions, we decline to embark on the adventure to which the defendant invites us, especially where the destination is an uncertain one and, travelled in the name of our Constitution, hard to return from.

## IV

In choosing the "inextricably intertwined" test, and more importantly in deciding how to apply that test here, we concur with the general trend followed in the State and Federal courts. Although the dissent states at the outset that it does not "cavil" at the choice of the phrase "inextricably related," it then proceeds to speak at every turn as if the test were whether the events were "closely connected to the crime charged," whether they "closely surround[ed]" the charged crime, whether there was a "close relationship" between the charged and uncharged offenses. It is on this basis that the dissent reaches a contrary conclusion. As we think we have demonstrated, see note 7, *supra,* that conclusion is not in accord with the case law or even with the one case it cites as supporting its similarity-based proposal. *United States* v. *Arnold, supra* at 41, 42, states specifically that the issue is "whether the *same* acts and factual predicates underlie both the pending and the new charges" and excluded the statements at issue because the uncharged and charged offenses "arose from the *same* predicate facts, conduct, intent and circumstances" (emphasis supplied).

Although the dissent's proposal is unsupported by authority,

---

[10]Prior to the Supreme Court's decision in *McNeil* v. *Wisconsin,* 501 U.S. 171 (1991), there was some dispute as to whether a defendant who invoked his Sixth Amendment right to counsel at arraignment simultaneously invoked his nonoffense-specific Fifth Amendment right to counsel for purposes of subsequent interrogation regarding unrelated crimes. See *United States* v. *Wolf,* 879 F.2d 1320 (6th Cir. 1989); *United States ex rel. Espinoza* v. *Fairman,* 813 F.2d 117 (7th Cir.), cert. denied, 483 U.S. 1010 (1987). This argument was disposed of in *McNeil* v. *Wisconsin, supra* at 177-178, which held that a defendant's invocation of his Sixth Amendment rights did not trigger his Fifth Amendment Miranda rights.

its conclusion compels us to probe more deeply and ask why the test we adopt and our application of it are better than the broader and more ambiguous rule which the dissent appears to propose. This is a question which can only be answered if we consider the purpose the rule is to serve and what constitutional value the rule we adopt is intended to implement. Neither test recommends itself for its self-evident quality, and we progress no further by saying that one or the other test better implements the right to counsel, whether under the Sixth Amendment or the Declaration of Rights, since what the right to counsel guarantees in these situations is precisely what is in question. We think that the beginning of wisdom — and perhaps very nearly its end — in this matter is the passage we quoted previously from Justice Brennan's opinion in *Moulton,* decided six years prior to *McNeil.* This statement makes it clear that, whatever the doctrine and contours which accompany the Sixth Amendment, uncounselled police questioning is not, in and of itself, a second rate or suspect state of affairs. The right to counsel is a more limited and balanced concept, as Justice Brennan's reference to "unnecessarily frustrat[ing] the public's interest in the investigation of criminal activities" amply demonstrates. *Moulton, supra* at 180. The right to counsel does not attach at all until formal criminal proceedings have been instituted, as explicitly taught by *Massiah* v. *United States,* 377 U.S. 201 (1964), and its progeny. The source of this right, as stated, is the text of the Sixth Amendment itself, which, in this respect, is no less protective than the text of the Declaration of Rights. Because the right at issue is quite simply the right to the assistance of counsel *when one has been charged with a crime,* then it is the criminal charge which calls that right into being and marks its extent. If it were otherwise, we would have no reason to stop at just those offenses which are similar to the charged offense, as it would be simpler just to say that counsel is required for all communications with an individual — whether or not such communications relate to a charged offense. If we hew to the right which is protected by the Constitution, however, the wariness which arises when the police question a charged person about other crimes stems from our need to avoid undermining that very right: that is the right to counsel in respect to *the charged* offense. If the questioning about other crimes is intended to, or does undermine, the charged person's right to be assisted by counsel in respect to the charged crime then the right we have

acknowledged requires that such questioning also be restrained.

The two tests discussed in this opinion and the dissent, the generally accepted narrow "inextricably intertwined" or "extremely closely related" test and the dissent's broader similarity-based test, may both be thought to safeguard an individual's right to counsel, because the closer the relation, the greater the risk that questioning about the uncharged crime will interfere with the right to counsel for the charged offense. But that is just the point in this case: there was neither the intention nor the risk that O'Rourke's questioning of Rainwater would disadvantage Rainwater, or interfere with his counsel's representation of him, *in respect to the September 10 theft, the one crime for which he had been charged.* As to that singular theft, Rainwater had already agreed to plead guilty and a joint recommendation of a suspended sentence had been agreed on. Thus, his discussion with O'Rourke could have had no impact on the outcome of that charged offense.

*Judgments affirmed.*

MARSHALL, J. (dissenting, with whom Wilkins, C.J., and Abrams, J., join). This case deals with that most fundamental right, the right to counsel. The motion judge never considered that issue; he should have, but did not, allow counsel to explore areas relevant to the defendant's right to counsel claims. The court today decides that issue, rather than remanding the case to the motion judge for a hearing on the defendant's right to counsel claims. I respectfully dissent.

The court observes that the judge "does not appear to have considered [the Fifth Amendment and Sixth Amendment to the United States Constitution] to be distinct claims." *Ante* at 542. The record is clear that the motion judge focused only on the defendant's Fifth Amendment voluntariness claim and disregarded his Sixth Amendment claim entirely.[1] It is possible that, had the motion judge considered the defendant's right to counsel

---

[1] For example, the first time defense counsel raised a question whether the Worcester police auto theft squad was investigating stolen automobiles that had "similar manners of entry, similar markings and they were — really the same 'M.O.,' " the judge responded, "It doesn't sound like it's relevant to me at all. We're talking here about *voluntariness* of statements" (emphasis supplied). When counsel pressed the point, stating, "The reason that I think it would be important is that the incident he was arrested for on September 10th was a crime that was extremely similar to the crimes that had taken place in the days preceding it," and that he wanted "to lay the foundation for the similarities," the judge responded: "I acknowledge that you're probably curi-

claims, he might have concluded that the charged and uncharged automobile thefts were not "inextricably intertwined." But he expressly declined to permit counsel to establish the relationship between those thefts. In my judgment that was error. The record was surely sufficient to give rise to a substantial issue whether the right to counsel, which had attached at the very least to the charged September 10 automobile theft,[2] carried over to the uncharged remaining offenses.

It is settled law that, once counsel has been named to represent a person charged with a crime, that person may not be questioned about that crime in the absence of counsel. See *Michigan* v. *Jackson,* 475 U.S. 625 (1986); *Maine* v. *Moulton,* 474 U.S. 159, 176 (1985); *Commonwealth* v. *Perrot,* 407 Mass. 539, 545 (1990). The court holds that in this case it was proper for a police officer to question the defendant about the uncharged automobile thefts because they were not "inextricably intertwined" with the offense already charged. I do not cavil at the choice of the phrase "inextricably intertwined"; the court correctly notes that other courts have used it. Rather, it is the application of that test to these facts with which I disagree. To tolerate, as the court does today, the interrogation that occurred here invites police questioning on matters in the forbidden zone.[3] In my view, a rule that prohibits custodial interrogation of events closely surrounding the charged crime would give

ous, but we are not going to go wandering into that swamp." Later when Rainwater's counsel again sought to raise the issue the motion judge responded, "I don't think you can go into it this way and I'm not going to let you." There were other similar colloquies with Rainwater's counsel during the hearing. Moreover, in summarizing his conclusions, the judge stated: "Not only do I determine there was no violation of the Miranda rights during these custodial interrogations, but I also determine that in the general sense of voluntariness, [the defendant's] statements were voluntary. I therefore deny the defendant's motion to suppress."

[2]There is an unresolved question concerning the scope of counsel's representation itself. At the hearing on the motion to suppress, counsel testified that, as she best remembered, at the bail hearing on September 10 the fact that Rainwater was a suspect in other automobile thefts was discussed. If counsel is correct, the interrogation by O'Rourke later that evening about the automobile thefts is even more troublesome. The motion judge said that he was unable to determine if there were such discussions on September 10. Nevertheless, the possibility of such discussions should have alerted the judge to the Sixth Amendment and art. 12 issues.

[3]I agree with the court that the closer the relation of the uncharged offenses to the charged offense, the greater the risk that questioning about the uncharged crimes will interfere with the right to counsel as to the charged offense. I do

clear guidance to police officers when they question suspects about uncharged crimes, and would give full effect to the "fundamental . . . right of a person accused of a serious crime to have the aid and advice of counsel." *Guerin* v. *Commonwealth*, 339 Mass. 731, 734 (1959). The court's decision today fails on both counts.

The record shows the following sequence of events. On September 10, 1992, Rainwater was arrested when he attempted to flee from a stolen automobile in which he had been a passenger when it was pursued by police. Later that day, Rainwater was brought to court and arraigned. Through the Committee for Public Counsel Services (CPCS), a bar advocate was appointed to represent Rainwater. In preparation for arguing the question of his bail, she met with Rainwater for between five and ten minutes in a holding cell at the courthouse. Counsel did not have the opportunity to discuss much with her client; she testified at the motion hearing that after the bail hearing Rainwater was "whisked off to the jail rather quickly" before she could meet with him again at the courthouse.[4] He was taken to the Worcester County house of correction. That same evening Officer James O'Rourke, a member of the auto theft squad of the Worcester police department, interviewed Rainwater.

O'Rourke testified at the hearing on the motion to suppress that he knew at the time that Rainwater had been arraigned and either had an attorney or had stated that he would hire one. Rainwater was brought to a conference room where, Rainwater testified, O'Rourke told him that he had come to talk "about the charges, the motor vehicles that were stolen." Rainwater testified that he asked O'Rourke "Shouldn't my lawyer be here?," to which O'Rourke replied, "If you sign this paper [she] won't need to be." Rainwater then signed a Miranda card presented to him by O'Rourke, and O'Rourke proceeded to

---

not agree with the court, on this record, that there was neither the intention nor the risk that the police questioning of the defendant would disadvantage him, or interfere with his counsel's representation of him, even in regard to the one crime for which he had been charged.

[4]Because it is not unusual for appointed counsel to have little time to consult with a client before the client is taken back to jail, a police officer who questions a suspect represented by counsel on the same day. as the arraignment (as occurred here) should understand clearly that he or she may not question the suspect on matters that are close to the charged offense; to do so jeopardizes the protections inherent in the right to counsel, and may jeopardize prosecution of an offense that is closely related to that matter.

question Rainwater about a series of automobile thefts, including the theft for which Rainwater had been arraigned that same day and for which counsel already had been appointed.[5] He obtained from Rainwater statements concerning seven automobiles stolen on August 27, August 30, September 7, September 8, September 9, and September 10, 1992.

In January, 1993, Rainwater was charged with six incidents of operating a motor vehicle without the authority of its owner, offenses that occurred on August 27 and 30 and September 7, 8, and 9 (two thefts).[6] It is in connection with the trial of those offenses that his claims arise.

In *McNeil* v. *Wisconsin,* 501 U.S. 171, 175 (1991), the United States Supreme Court considered the following question that previously had been certified from the Court of Appeals to the Supreme Court of Wisconsin: "Does an accused's request for counsel at an initial appearance on a charged offense constitute an invocation of his fifth amendment right to counsel that precludes police-initiated interrogation on *unrelated,* uncharged offenses?"[7] The Supreme Court concluded for the first time that under the United States Constitution the Sixth Amendment right to counsel is "offense specific."[8] Because the offenses in *McNeil* were wholly unrelated to each other (they occurred weeks

---

[5]A "supplemental report" signed and filed by O'Rourke three days later on September 13, 1992, summarizes his interrogation of Rainwater that evening and makes this clear. At the hearing on the motion to suppress O'Rourke testified that during his interrogation of Rainwater on the evening of September 10, he did *not* discuss with Rainwater the theft of the Toyota Corolla that had occurred earlier that day at the Washington Heights complex. His testimony is entirely inconsistent with his own contemporaneous written record. The motion judge nevertheless found that no reference was made to the September 10 theft during the interrogation. That finding is clearly erroneous, as the Commonwealth now concedes.

[6]On September 17, 1993, Rainwater entered a guilty plea with respect to the automobile theft on September 10, 1992, the occasion on which he had been apprehended by the police and for which he obtained counsel.

[7]The "question presented" in *McNeil* was similarly phrased: "Did defendant's acceptance of assistance of counsel and appearance with counsel at initial hearing on charged offense amount to invocation of Fifth Amendment right to counsel that precluded police-initiated interrogation on *unrelated,* uncharged offense while defendant was in continuous custody?" (Emphasis added.) 59 U.S.L.W. 3354 (Nov. 6, 1990).

[8]In its ruling today the court describes the " 'offense-specific' nature" of the Sixth Amendment as announced in *Maine* v. *Moulton,* 474 U.S. 159 (1985). *Ante* at 545. Justice Brennan, the author of the Court's opinion in *Maine* v. *Moulton,* did not use the term "offense specific," and had no reason to. In

apart and in different locations),[9] the Court was not required to and did not elaborate on the term (new to constitutional jurisprudence) "offense specific." It did not suggest that an offense is "specific" for Sixth Amendment purposes if it "could and would have to be proved separately," the phrase used by the court today.[10] Since *McNeil*, some United States Courts of Appeals have concluded that when the offenses are "inextricably intertwined," the Sixth Amendment right to counsel carries over to the uncharged offenses. See *United States* v. *Arnold*, 106 F.3d 37, 41 (3d Cir. 1997); *United States* v. *Carpenter*, 963 F.2d 736, 740 (5th Cir.), cert. denied, 506 U.S. 927 (1992); *United States* v. *Hines*, 963 F.2d 255, 257 (9th Cir. 1992). Using that test the court concludes that Rainwater's right to counsel that had attached to the September 10 theft for which he was charged did not carry over to the other thefts.

I dissent from the court's conclusion and its reasoning in two respects. The court first observes that if the motion judge had "specifically found" that the interchange between O'Rourke and Rainwater about the presence of his lawyer had taken place, "we would not be so ready to say that the defendant's Fifth Amendment rights articulated in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), had been fully accorded." *Ante* at 544 n.2. While the judge did not make any such specific finding, there was no

*Moulton* the only issue under consideration was the admissibility at trial of a statement obtained by a secret government agent from the accused after he had been indicted. I agree with this court's discussion of the constitutional value of the rule described by Justice Brennan. My point is a different one: in *Moulton* the Court did not consider police-initiated interrogation on *related*, uncharged offenses. That is the question in this case.

[9]McNeil was arrested in Nebraska pursuant to a warrant charging him with an armed robbery in West Allis, Wisconsin, and transported back to Wisconsin. While in custody detectives interrogated him and he was charged in connection with a murder and armed burglary that had occurred in Caledonia, Wisconsin. *McNeil*, *supra* at 173-174.

[10]I recognize that the court intends this to be a sufficient though not a necessary condition for a violation of the right to counsel. In my view, however, it directs the inquiry in the wrong direction. Whatever phrase we use to describe our constitutional test, I prefer a rule that directs a judge to consider the factual similarities and connections between the charged offense and the uncharged offenses, rather than a rule that directs the inquiry toward what is necessary to prove the charged offense. See, e.g., *State* v. *Sparklin*, 296 Or. 85, 93 (1983) ("Once an attorney is appointed or retained, there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing the defendant on that charge is notified and afforded a reasonable opportunity to attend").

testimony by O'Rourke (or anyone else) to rebut it. I conclude that there is a substantial possibility that Rainwater's Fifth Amendment right to counsel was violated.[11] Certainly his statement to O'Rourke, if made, "can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil* v. *Wisconsin*, 501 U.S. 171, 178 (1991).

I also conclude that the court misapprehends Rainwater's Sixth Amendment claim with respect to this aspect of O'Rourke's interrogation. There is a close relationship between the incidents about which O'Rourke sought to question Rainwater and the offense for which Rainwater already had secured counsel. Rainwater's reference to his lawyer followed O'Rourke's statement that he wanted to talk "about stolen automobiles." In my view O'Rourke acted in a manner that "circumvent[ed] and thereby dilut[ed]" the protection afforded Rainwater by his right to counsel. *Maine* v. *Moulton, supra* at 171.

As to the relationship between the charged and uncharged offenses, in the wake of *McNeil*, courts have suggested a number of factors that may be considered in determining the scope of the Sixth Amendment protection in these circumstances. While the boundaries are not always clear, "courts have looked for similarities of time, place, person and conduct." *Arnold, supra* at 41. See *Whittlesey* v. *State*, 340 Md. 30, 55 (1995), cert. denied, 516 U.S. 1148 (1996); *United States* v. *Kidd*, 12 F.3d 30, 33 (4th Cir. 1993), cert. denied, 511 U.S. 1059 (1994); *Hendricks* v. *Vasquez*, 974 F.2d 1099, 1105 (9th Cir. 1992), cert. denied sub nom. *Hendricks* v. *Calderon*, 116 S. Ct. 1335 (1996); *United States* v. *Carpenter*, 963 F.2d 736, 741 (5th Cir.), cert. denied, 506 U.S. 927 (1992). In this case all the automobile thefts occurred within days of each other, all the thefts took place within the same section of Worcester, and the modus operandi was identical in each case; the automobiles were stolen using either a screw driver or a dent puller, and were then each marked in the same distinctive manner, and subsequently abandoned. In each case the marks included the word "Kings,"

---

[11] I agree with the court that generally there is no requirement that there be a specific finding as to each item of unsupported testimony. *Ante* at 544 n.2. Where, as here, it is clear that the motion judge focused his attention on the Fifth Amendment voluntariness of the defendant's confession, not on his Sixth Amendment right to counsel claim, I believe a specific finding is warranted.

the message, "Police, see if you can catch us," and a number, apparently signifying the sequence in which they had been stolen. The offenses all were investigated by the same automobile theft squad of the Worcester police, the interrogating police officer considered them all as one, and all offenses but one were charged and tried together. On this record I would require the motion judge to consider whether the incriminating statements elicited by O'Rourke on September 10 were obtained in violation of Rainwater's art. 12 right to counsel and should have been suppressed.[12]

If we adhere to the view under our Constitution that the United States Supreme Court has adopted with respect to the Sixth Amendment that once the right to counsel has attached *all* further police interrogation is *not* prohibited (a claim that we need not reach in this case), the impermissible area of police questioning of custodial suspects needs to be defined as clearly as possible. The reason is not because we view uncounselled police questioning, in and of itself, as a second rate or suspect state of affairs, but to avoid precisely the line blurring that occurred in this case. I believe a rule that places police officers on notice that it is constitutionally impermissible to interrogate a custodial defendant about other uncharged crimes closely connected to the crime charged unless the attorney representing the defendant on that charge consents, is a rule that most effectively protects the art. 12 guarantee of the right to counsel and the equally important interest (shared by the police and the public) of the investigation of crimes.

---

[12]It is not clear that what happened here is permissible under the Sixth Amendment either. See, e.g., *United States* v. *Arnold*, 106 F.3d 37 (3d Cir. 1997) (Sixth Amendment prohibits police interrogation on charge of attempted murder of witness by defendant after he was indicted for intimidation of same witness). The problem here is compounded because the motion judge did not make findings on the crucial point whether the defendant inquired about having his lawyer present at the interview, and because the motion judge never considered the defendant's Sixth Amendment or art. 12 rights.