COMMONWEALTH *vs.* THOMAS M. LENAHAN.

No. 98-P-1987.

Bristol. March 10, 2000. - October 5, 2000.

Present: ARMSTRONG, C.J., PERRETTA, & BECK, JJ.

*Solicitation to Commit Felony. Error, Harmless. Evidence,* Best and second-ary, Prior misconduct, Intent. *Entrapment.*

At a criminal trial, error, if any, in the use as evidence of an extrajudicial statement of the defendant was harmless beyond a reasonable doubt, where the statement was cumulative of other admissible evidence. [183-185]

At a criminal trial, there was no error in the Commonwealth's introduction in evidence of a photocopy of an incriminating document created by the defendant that had been in police custody but that could not be found after the defendant's bail hearing. [185-186]

At the trial of a defendant on a complaint alleging solicitation to murder his wife, the judge did not err in admitting evidence, which was relevant to the defendant's intent, that the defendant had previously attempted to push his wife off a cliff. [186]

Evidence at the trial of a complaint for solicitation to commit murder was more than sufficient to demonstrate the defendant's intent that murder be committed. [186]

There was no merit to a criminal defendant's claim that asserted evidence of entrapment entitled him to a required finding of not guilty on a complaint alleging solicitation to commit murder. [187]

COMPLAINT received and sworn to in the Attleboro Division of the District Court Department on August 25, 1997.

The case was tried before *John J. Dolan,* J.

*Paula Lynch Hardiman* for the defendant.

*David Keighley,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from his convictions by a District Court jury on a two-count complaint charging him with solicitation to murder his wife and a man with whom he thought her to be having an affair, the defendant claims error in numerous rul-

ings made by the trial judge. Concluding that all the evidence presented by the Commonwealth was admissible and seeing no error in the denial of the defendant's motion for a required finding of not guilty, we affirm the judgments.

1. *The facts.* There was evidence to show that on August 21, 1997, Gerald Genest received a call in Attleboro from the defendant, his friend. As described by Genest, the defendant spoke in an excited, persistent, and demanding tone and informed Genest that he was calling from the Adult Correctional Institution in Rhode Island, that he had close to $3,000, that he wanted Genest to find someone who would kill his wife, and that he would call again the next day. Although Genest regarded the defendant as serious in his demand, he did not immediately notify the police because he did not know anyone who would commit such an action for money and because he hoped the defendant would change his mind. However, the next day Genest read a newspaper article concerning an incident between the defendant and his wife that had occurred at Diamond Hill Park in Cumberland, Rhode Island.[1] As the evidence unfolded, the jury learned that the incident was the defendant's unsuccessful attempt to push his wife to her death from a cliff in the park.

After reading the article, Genest contacted the police in Pawtucket, Rhode Island. They referred Genest to the police in Attleboro, who, in turn, referred him to the Massachusetts State police, and Genest spoke with State Trooper Mark Frenzo. Frenzo was present at Genest's home the next day when the defendant called, as he told Genest he would. The defendant, presumably now on bail, agreed to meet with Genest at a location in Rhode Island. Genest arrived at the appointed time and place with Frenzo whom he introduced to the defendant only as a "friend of mine that we spoke about." The men decided to go someplace where they could talk. Although the defendant expressed a desire to remain within the boundaries of Rhode Island,[2] he nonetheless agreed to go to a Chinese restaurant in Attleboro.

---

[1] Genest was also allowed to testify about the defendant's visit to his home a few weeks before August 21, 1997, when the defendant expressed his anger about the fact that his wife wanted a divorce and his desire for her death. Genest also related how the defendant, earlier that summer, told about his plan to stage a hiking accident, that is, he wanted to push his wife from a cliff.

[2] He explained that he had been advised by his attorney on the Rhode Island charges not to leave that State.

Upon being seated at their table at the restaurant, Genest and the defendant sat across from Frenzo. After some small talk, Genest excused himself for the men's room. Upon his return, he saw that the defendant was seated next to, rather than across from, Frenzo. Genest took a place at the bar where he could hear the conversation between the defendant and Frenzo. He testified that he heard the defendant say that he could obtain one thousand dollars for the sale of his truck and that he wanted his wife "to suffer." At some point, Frenzo left the table, and the defendant told Genest that he had no problem with the arrangements, that is, the procedure or payments. The defendant was arrested in the parking lot of the restaurant.

Frenzo testified that, when he and Genest met the defendant in Rhode Island, the defendant told him how he believed that his wife was involved with another man and that he wanted her to disappear. He explained that he recently had been arrested and was under charges in Rhode Island for attempting to kill his wife and that, upon advice of counsel, he should not leave the jurisdiction of that State. Nonetheless, as related by Frenzo, the defendant acquiesced to his (Frenzo's) desire for Chinese food, and the three men went to a restaurant chosen by Frenzo and located in Massachusetts.

Frenzo related that, once at the restaurant and after Genest excused himself from the table, the defendant told him that he wanted his wife and her suspected male friend to disappear by means of painful killings and that he would sell his truck in order to satisfy Frenzo's requests for an advance payment for the killings. The defendant also wrote a description of his wife, her alleged boyfriend, her car, and her place of work on a placemat. This information prompted Frenzo to comment about the wife's size and the fact that the defendant was unable to push her from the cliff. The defendant responded to Frenzo's observation with the comment that he was unable to push his wife to her death because he did not want his children, who were coming into view, to see what was happening.[3]

According to Frenzo's testimony, he advised the defendant that he would have to pay $1,000 in advance and that because two killings cost more than one, another $6,000 to $7,000 would be due after his work was completed. The defendant responded to these arrangements by stating that he would sell his truck and

---

[3]As put by the defendant to Frenzo, the "kids came around the corner and I didn't want them to see . . . ."

pay Frenzo $1,000 the very next day and provide him with any other necessary information through Genest.

Next came the defendant's wife. She testified that, on August 18, 1997, she and the defendant, who earlier had informed her that he would oppose any request for a divorce, went rock climbing with their children in Cumberland. As they reached the top of a cliff, their children ran off to play. She stood at the edge of the cliff, about 120 feet high, and faced the defendant. She described how the defendant attacked her and used his entire body in attempting to force her from the edge of the cliff. Her reaction was to drop to her knees and make it more difficult for him. Nonetheless, the defendant continued with his struggle to push her from the cliff until he realized that their children were present and standing beside her. The family returned home, the defendant went to work, and his wife filed a report of the incident with the Cumberland police.

Testifying on his own behalf, the defendant related that his complaints to Genest about wanting his wife dead were mere figures of speech not to be taken seriously and that his assault upon his wife at the edge of the cliff was no more than a stupid joke. He also acknowledged that he did complain about his wife to Frenzo and that, although uncomfortable with Frenzo from the outset, he did not realize he was a "hit man" until he, Genest, and Frenzo were at the restaurant. Frenzo ordered the defendant to sit next to him, pressed him for information about his wife, and made monetary demands upon him. According to the defendant, he became so intimidated by Frenzo that he was afraid to leave the restaurant.

As related by the defendant, he gave Frenzo a written description of his wife out of fear of him and in an attempt to placate him so that he could leave the restaurant. The defendant admitted that he told Frenzo that he tried to push his wife off a cliff, that he ceased his attempt only because his children came upon the scene, that he needed a solution to his situation, and that he did not care how the murders of his wife and her friend were accomplished. He insisted, however, that at no time did he truly intend that his wife and her friend be killed.

2. *The defendant's statement to Frenzo.* Prior to trial, the defendant filed a motion in limine in which he sought to suppress as evidence his statement to Frenzo that he was unable to push his wife from the cliff because of his children and not because of her size. The motion was denied. At trial, defense

counsel did not lodge an objection to Frenzo's testimony concerning that statement. The defendant now claims error in the denial of his motion, arguing that his statement was made in violation of his right to counsel, as guaranteed him under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, a right which he claims had attached by reason of the Rhode Island charges pending against him at the time of his statement.[4] The bottom line to his argument is that there was insufficient evidence of his intent to kill his wife and her friend without his challenged statement to Frenzo.

For purposes of decision only, we give the defendant the benefit of several generous assumptions, that is, we will assume that his claim is based upon the Fifth as well as the Sixth Amendment, see *Commonwealth* v. *Rainwater*, 425 Mass. 540, 543-546 (1997); that the Rhode Island charge was "inextricably intertwined" with the present complaint for solicitation to commit murder, *id.* at 547-549; that it was, therefore, error to deny the motion in limine and admit the statement in evidence at trial on the complaint; and that, notwithstanding the defendant's failure to object to the ruling on his motion, either at the time of the hearing or at trial, the applicable standard of review is whether the assumed error was harmless beyond a reasonable doubt.[5] See *Chapman* v. *California*, 386 U.S. 18, 24 (1967).

With these assumptions in place, we conclude that, if the use

---

[4]We do not have a copy of the motion before us. Moreover, it is unclear from our reading of the transcript of the hearing on the motion whether the defendant was asserting only his right to counsel or whether he was also alleging his right to refuse to incriminate himself. The transcript of that hearing reflects that defense counsel argued the motion on the basis that the challenged statement was obtained in violation of the defendant's "constitutional rights," all without specification. On appeal, the defendant confines his argument to a claimed violation of his right to counsel, as guaranteed by the Federal and State Constitutions (Sixth Amendment and art. 12, respectively).

[5]Were it necessary for us to reach the merits of the defendant's claim without the benefit of our assumptions, we would have concluded that his constitutional rights were not violated for the reasons, if no other, that the two crimes, attempted murder and solicitation to commit murder, occurred at different times and in different locations involving different sovereigns; the defendant requested the meeting with someone willing to murder his wife and her friend; Frenzo was responding to the defendant's solicitation to commit a crime rather than seeking evidence relevant to any past crime for which the defendant was a suspect; the statement in issue was not a response to any direct or indirect question from Frenzo; and there was nothing to preclude the defendant from seeking to suppress any use of the statement in the proceed-

of the defendant's statement to Frenzo was error, that error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Rosario*, 430 Mass. 505, 511 (1999) (factors to be considered in analyzing harmlessness of error include importance of the evidence to prosecution's case, frequency of reference to challenged evidence, whether challenged evidence was cumulative, and whether other evidence was overwhelming); *Commonwealth* v. *Bachir*, 45 Mass. App. Ct. 204, 209 (1998) (admission of evidence alleged to have been obtained in violation of right to counsel held harmless beyond a reasonable doubt where challenged statements were cumulative of more incriminating evidence). We think that, even without the challenged statement, the testimony of Genest and Frenzo provided overwhelming evidence of the defendant's guilt and that Frenzo's testimony concerning the challenged statement by the defendant was cumulative of the wife's testimony describing the defendant's attempt to push her from the cliff and his ceasing his effort upon seeing the children. In light of this evidence, we conclude that the defendant's challenged statement to Frenzo "supplied no missing element in the proof" of the uncharged crime, solicitation to commit murder, see *Commonwealth* v. *Rainwater*, 425 Mass. at 551, and that any error was harmless beyond a reasonable doubt.

3. *The placemat.* As proof of the defendant's intent, the Commonwealth was allowed to put in evidence a copy of the placemat on which the defendant had written a description of his wife, her place of work, car, and alleged boyfriend. The defendant claims that introduction of the copy into evidence violated the so-called "best evidence rule." That rule requires that, where the contents of a document are to be proved, the party must either produce the original document or show a sufficient excuse for its failure to offer the original.

We think it obvious that the Commonwealth was not offering the placemat to prove the matter of the truth of the contents of the writing, that is, the physical appearance of the defendant's wife (or her car or place of work) — indeed, she appeared at trial and testified on behalf of the Commonwealth. See *Commonwealth* v. *Koney*, 421 Mass. 295, 303 (1995) (identification card not hearsay because not offered for truth of matters on the

ings to which it pertained, that is, the Rhode Island charges to which he ultimately entered a guilty plea. See generally *Commonwealth* v. *Rainwater*, 425 Mass. at 547-548 n.5.

card). Even assuming, however, that the "best evidence rule" is applicable, we would see no error in the trial judge's ruling. There was evidence to show that, after the defendant's arrest, the police retained custody of the original document, that the original was thereafter introduced in evidence at the defendant's hearing on bail, and that, after that hearing, the document could not be found. See *Fauci* v. *Mulready*, 337 Mass. 532, 540 (1958); *Old Colony Trust Co.* v. *Shaw*, 348 Mass. 212, 219 (1964); *Commonwealth* v. *Koney*, 421 Mass. at 303.

4. *The defendant's prior bad act.* We see no error in the trial judge's determination that evidence of the defendant's prior attempt to push his wife from a cliff could be considered by the jury on the issue of his intent. See *Commonwealth* v. *Fordham*, 417 Mass. 10, 22-23 (1994); *Commonwealth* v. *Fallon*, 423 Mass. 92, 97 (1996); *Commonwealth* v. *Cormier*, 427 Mass. 446, 450 (1998). His finding that the probative value of the evidence was not substantially outweighed by its prejudicial effect was far from palpable error, especially in light of the defendant's testimony. See *Commonwealth* v. *Ashman*, 430 Mass. 736, 741-742 (2000).

5. *Evidence of the defendant's intent.* Conviction of the common-law crime of solicitation to commit murder requires proof that the defendant solicited, counseled, advised, or otherwise enticed another to commit murder and that the defendant intended that the person in fact commit the murder. See *Commonwealth* v. *Harrington*, 3 Pick. 26, 29-30 (1825); *Commonwealth* v. *Willard*, 22 Pick. 476, 478-479 (1839); *Commonwealth* v. *Flagg*, 135 Mass. 545, 549 (1883); *Commonwealth* v. *Barsell*, 424 Mass. 737, 738 (1997).[6] See generally 2 LaFave & Scott, Substantive Criminal Law § 6.1, at 3 (1986). In concluding that there was more than sufficient evidence of the defendant's intent that the murder be committed to support the charges set out in the complaints, we look to his conversations with Genest (in which he expressed his desire that his wife be killed and that Genest find someone willing to perform the deed), his statements to Frenzo (that he wanted his wife and her friend to be murdered, that the murders should be painful, and that he would sell his truck in order to meet Frenzo's demand for an advance payment), the copy of the placemat, and the wife's testimony concerning his attempt to push her off the top of a cliff.

---

[6] That the solicited murder is in fact not committed does not constitute a defense to the crime. See *Commonwealth* v. *Flagg*, 135 Mass. at 549.

6. *Evidence of entrapment.* Even assuming that the defendant's testimony showed that Frenzo pressured him, that fact would not entitle the defendant to a required finding of not guilty. There was evidence to show beyond a reasonable doubt that the defendant was predisposed, ready, willing, and able to commit the crime charged upon being given the opportunity to do so. See *Commonwealth* v. *Miller,* 361 Mass. 644, 651-653 (1972); *Commonwealth* v. *Shuman,* 391 Mass. 345, 351 (1984); *Commonwealth* v. *Monteagudo,* 427 Mass. 484, 487-488 (1998); *Commonwealth* v. *Urena,* 42 Mass. App. Ct. 20, 21 (1997).

*Judgments affirmed.*