COMMONWEALTH *vs.* JERRY HAMEL.

No. 99-P-913.

Middlesex. February 12, 2001. - August 9, 2001.

Present: JACOBS, KAPLAN, & DUFFLY, JJ.

*Attempt. Homicide. Practice, Criminal,* Instructions to jury. *Solicitation to Commit Felony.*

At a criminal trial, the judge erred in denying the defendant's motions for required findings of not guilty on indictments charging attempted murder, where there was no overt act that came close to or formed part of any physical perpetration of any murders. [256, 259-260]

Discussion of the development of the Massachusetts law of criminal attempt. [257-259]

At a criminal trial, the judge, in properly charging the jury with regard to the common-law crime of solicitation, did not err in refusing to add to the charge a requirement of "specific intent." [260-261]

In the circumstances, the judge at a criminal trial did not err in admitting certain statements by the defendant that he was involved in growing and selling marijuana [261-262], and in declining to admit other evidence intended to assist in proving the defense claim of a "frameup." [262]

INDICTMENTS found and returned in the Superior Court Department on August 21, 1996.

The cases were tried before *Elizabeth J. Dolan,* J.

*Chauncey B. Wood* for the defendant.

*Sean Gordon,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Indictments by a Middlesex grand jury charged the defendant, Jerry Hamel, with the statutory crime of attempted murder of four named individuals, G. L. c. 274, § 6,[1] and with the common-law crime of soliciting others to commit those

[1]"Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration, shall, except as otherwise provided, be punished as follows:
. . . ."

murders. A jury found the defendant guilty of all the charges.[2] Upon the defendant's appeal, we reverse the judgments of conviction of attempted murder for error in denying the defendant's motions for required findings of not guilty. We affirm the judgments of conviction of solicitation.

1. *Evidence in detail.* In May, 1996, the defendant was an inmate at the Massachusetts Correctional Institution (M.C.I.), Concord, sharing a cell in the segregation unit with the inmate David Vermette. The defendant told Vermette he wanted to get rid of Richard Bernier, the ex-husband of the defendant's wife. The defendant was unaware that Vermette was an informant ready to serve the prison authorities. Vermette worked to persuade the defendant that he had means of evading the guarded prison telephone system and putting himself, and also the defendant, in direct communication with hitmen on the outside. On May 14, Vermette spoke with Lieutenant Randy Fisher, head of the inner perimeter security team at Concord, and told him his cellmate said he wanted to have a man killed. Fisher assumed the role of "Jack," a feigned hitman, in the evolving story.

We have Fisher's testimony about events through May 29. On May 15, Vermette made a call from the cell to Fisher and passed the phone to the defendant. The defendant identified Richard Bernier as the one to be taken care of. Fisher said he would want to check the defendant out and the job would cost a lot. The defendant was to call in a couple of days. On May 17, with the same phone arrangement, the defendant gave Fisher some particulars about Bernier (address in Baldwinville, driving a white Plymouth Horizon car) and told Fisher of his hatred of the man because he had earlier raped his wife and was currently harassing her. The defendant said he could pay for the job by giving Fisher access to a marijuana field worth, he said, between twenty and thirty thousand dollars.

(The foregoing two conversations went unrecorded: Fisher

---

[2]The defendant was sentenced on the criminal attempt indictments to concurrent four to five year terms at M.C.I., Cedar Junction, and on the solicitation indictments to concurrent two and one-half year terms in the house of correction at Billerica, to be served from and after the sentences on the attempt indictments.

was not alert to record the first, and the recording apparatus was out of order to handle the second. Subsequent conversations were recorded; the recordings were received in evidence and played to the jury.)

Vermette phoned Fisher on May 21. He said the defendant had been talking of an accident befalling his parents as a further means of his paying for the killing of Bernier. The defendant said he wanted to make sure to raise enough money and confirmed that he wanted his parents (and a neurotic older brother who lived with the parents) disposed of, by which he would come into his parents' house and savings and other assets. He also mentioned a motorcycle, car, tools, and other things at the house. Fisher expressed unease with the defendant's "switching shit" and now adding three targets, which would naturally increase the price. Fisher appeared still interested in the marijuana field and the defendant described for Fisher in some detail the location of the field in Gardner and how to reach it. Fisher gave the defendant a name, "Brian Kelly," and a postal address, P.O. Box 1892, Boston 02205, to which the defendant could send pictures or other material needed for the job. Fisher thought the matter could be wrapped up in a month's time.

The defendant meanwhile was having conversations daily with his wife, Angela. On May 22, in the midst of a long, intimate talk, the defendant asked his wife to send him a picture of Bernier, so that, he said, "a friend" could see it. The next day, in one of a number of calls, the defendant expressed concern about Angela's coming home late at night after work: he mentioned the route would take her through Baldwinville. (Bernier was and had long been under restraining orders which he had regularly violated.)

The defendant's concern materialized. When the defendant spoke with Angela on May 24, she told him in pain and chagrin that Bernier had concealed himself in the house the previous evening and, after she arrived home from work and was asleep, had set upon her and fought with her and beaten and again raped her. After the rape Bernier told his victim to tell her husband he now had "damaged goods." Angela had been at the hospital and received treatment including the preparation of a

"rape kit." Now she was at home, feeling wretched, with police present in the house. The defendant in the telephone talk was volubly supportive of his wife and enraged against Bernier.

On the twenty-seventh, the defendant and Angela excoriated Bernier. The conversation went on with how the defendant's parents, especially his mother, had mistreated or ignored him. The theme returned in a conversation on May 28. The parents ("psycho [mother] and partner") could get into a "bad car accident"; someone might "run them off the road and then take off . . . ." This would be "just income for me"; the defendant and wife "could buy a newer house" and "put their ashes in our garden out behind our house for fertilizer."

To return to the Fisher-Vermette-defendant conversations. In a call on May 26, Fisher emphasized he needed background on the parents — their habits, routines, joint doings. With this help, all would be "set."

A warrant was out for Bernier when Fisher and the defendant talked on May 28. He was on the run, charged with heavy offenses based on the rape episode of May 24. This, said Fisher, complicated matters, but not much: Bernier was probably somewhere in his usual area and, in Fisher's judgment, would be out (presumably on bail) in any event. Fisher gave the defendant and Vermette the telephone number at which "Mark" could be reached. (Mark was the other feigned hitman, actually State Trooper Brian Connors, assigned to the case by agreement between Fisher's superiors and the State police.) Fisher said he was going out of State for some time, and they should call Mark. There was talk of how to handle the loss of telephone connection with Jack that would occur if the defendant was moved to M.C.I., Shirley, as was expected. But Mark could visit there. The defendant said he had already sent along some material, evidently through "Brian Kelly." Fisher asked, "I take it you still want to go forward?" Answer, "Oh, yeah." "Even more so, I would imagine," said Fisher, for Angela was to be avenged.

Trooper Brian Connors arranged for a special so-called "hello" line. On May 29, Vermette (with the defendant alongside) got through to him to say the defendant was being moved that day to M.C.I., Shirley. Bernier had been found and

arrested so that part of the scheme could be put "on hold." The marijuana field might serve as money "up front" and, in addition, the defendant said he had sent (to the Brian Kelly address) a "bill of sale" covering a motorcycle, a car, and tools.

On May 29, just after the phone call, Connors collected from the Brian Kelly postbox an envelope containing a rudimentary bill of sale, instructive data about Bernier, and descriptions of the family members and their habits, including the activities that might find them together.

Testimony by Connors takes over the narrative at this point. On June 3, after smoothing his way by informing the proper officer at Shirley of his undercover role, he visited the defendant there.[3] A woman (in fact Angela) was visiting the defendant at the time, so Connors did no more than ask whether the defendant still wanted to talk to him, still wanted to do that; answer, yes.

On June 6, Connors visited again and was alone with the defendant. The defendant assured Connors his wife did not know anything. He still wanted to go through with the matter. Responding to the defendant's worry about providing enough up front, Connors said he would get to the marijuana field. There was discussion of just what would be available after the parents and brother were gone — the house, any savings, life policy, etc. (but doubt as to how long realization of money might take). Vermette had spoken of a charge of $5,000 per person killed, but that might change. Connors said they were expecting sketches of the house and field and the defendant said he would supply them.

As to the family, the defendant said they didn't mean anything to him, he didn't care. A picture presented itself — the deranged brother kills his parents and then kills himself. If the defendant was then in prison, fine, he would be clear of suspicion; if out of prison, he would try to be in New York or elsewhere at the time.

Connors with Fisher and another officer went out and found the marijuana field on June 12 and took pictures of the plot,

---

[3]The defendant had lost visitation rights at Concord but, as prison veterans knew, there would be some delay in the "paperwork" reaching Shirley, during which visits there would be possible.

eight by twelve feet, twenty to twenty-five plants, two to three feet tall.[4]

After a visit to Shirley on June 24 which was aborted when Angela was seen at the prison about to visit, Connors attended on June 28. Now Bernier was reported out of prison, and so perhaps first in line for killing. Connors said he had seen the field. He recognized the field had value, and thought the defendant would have plenty more assets in time. The defendant said it would be "well worth it" even if he had to pay out ninety percent of all he got. Connors said the price for the family would be $20,000 (because there was no cash up front) and the price for Bernier had to be considered.

The defendant reiterated he still wanted to do this, he was not getting cold feet, he was ready to go on. Connor said they were just waiting for the sketches (none was now needed for the field), and once they received them, "we would be ready to go, and . . . we were prepared to go." There was discussion of how to enter the house, of the layout of the house; the defendant talked Connors through the house room by room.

Shortly after this visit, Connors drew from the indicated post office box two envelopes addressed to Brian Kelly. One contained a layout sketch of the parents' house and a note: "The first problem we discussed, gone by the tenth, the second it doesn't matter when it can be worked on." The other envelope, with postmark July 1, said the first problem was "immediate and foremost" and the second involving money could wait. The defendant wrote there should be no link between the Bernier and family killings. He was "making one hundred percent sure" he and Mark were "in agreement."

On July 18, Connors picked up an envelope with sketches of the house, front and back, and markings to show which rooms, reached through windows, might be vacant and which occupied (the defendant could not obtain pictures). The defendant's note enclosed said "30" looked right if he was happy when the job was finished.

---

[4]The record is not clear about the status of the field. It indicates other persons were growing the plants and would harvest them around September 1. The defendant was suggesting that the hitmen should come in ahead of time and take the crop, which looks like hijacking.

Connors with two other officers went to the marijuana field on July 29 and cut down the plants, now five feet tall; these were later certified to contain 5.5 pounds of vegetable matter with marijuana content. Fully handled, the plot might yield marijuana drug with an estimated value of $20,000.[5]

On August 11, 1996, the defendant stood indicted for attempted murder and solicitation of murder.[6]

2. *Synopsis.* With an eye to the elements of the crime of attempted murder — specific intent, overt act, and nonachievement of the substantive crime, see *Commonwealth* v. *Dixon*, 34 Mass. App. Ct. 653, 655 (1993) — we may summarize the material evidence as follows.

There was adequate evidence of intention and nonconsummation.

As to overt act: The defendant solicited the officers as feigned hitmen to kill the four persons (although, because of the officers' efforts to have the defendant commit himself to the enterprise, the defendant appears a solicitee as well as a solicitor). The defendant made a kind of upfront payment in the form of information about access to the marijuana field, and he promised payment after the event, in a somewhat uncertain amount, out of assets to be recovered. He furnished information in the form of descriptions of the intended victims and their habits, as well as descriptions and sketches of the house. There was much conversation, but, except insofar as an "accident" was spoken of, and the parents' house might possibly serve as a locus for killings, there was no scheme, and surely no scheme in any detail, for carrying out the multiple murders contemplated. There were no acts, on the part either of the defendant or of the officers, that came close to or formed part of any physical perpetration of any murders.

---

[5]In his defense, the defendant tried at great length through his own and his wife's testimony to prove he was framed by a combination including Vermette, his parole officer Jerry Lynch and Lynch's supervisor, and police. It was hinted or suggested that it was Brian Connors who was the rapist on the morning of May 24.

[6]Connors retrieved envelopes postmarked August 30 and September 8, 1996. The letters enclosed pleaded with Jack to get the indictments dropped. The defendant said he had furnished descriptions of Bernier and the family but he didn't want to kill anyone.

3. *Doctrine of criminal attempt.* The Massachusetts law of criminal attempt harks back to Justice Holmes. Holmes tried to give to "external" or "objective" standards a controlling force in criminal law (as well as in the law of torts).[7] There were some conventional offenses, however, where guilt was explicitly made dependent on certain personal intentions of the accused. Criminal attempts were in this class. Holmes reconciled his external-standards thesis to this condition, as his biographer Professor Howe observed, by propounding "that the law's occasional concern for the actual intent which motivated conduct was not the reflection of its disapproval of a sinful mind but of its recognition that the probability of injury is increased when the offender intends to do harm."[8] The law must be careful not to overplay the role of intention in such an inchoate crime as attempt, lest the result be precisely to punish the mere possession of a sinful mind. The consequence of Holmes's line of reasoning, as developed in The Common Law 65-70 (1881), and his opinions in *Commonwealth* v. *Kennedy,* 170 Mass. 18 (1887), and *Commonwealth* v. *Peaslee,* 177 Mass. 267 (1901),[9] was that in the duality of intention and overt act that is the heft of the crime of attempt, what the actor in fact did toward fulfilling the intention must have been dangerously close to the consummation of the object crime to serve as the crucial overt act. Holmes summed up the matter thus in the last of his three opinions discussing criminal attempts: "An attempt, in the strictest sense, is an act expected to bring about a substantive wrong by the forces of nature. With it is classed the kindred offence where

---

[7]This general approach is neatly challenged by H.L.A. Hart, Punishment and Responsibility 38-39, 242-244 (1968).

[8]Howe, Justice Holmes: The Proving Years 183 (1963).

[9]In the *Kennedy* case there was overt act enough in the defendant's trying to poison the victim to death by lining the victim's moustache cup with "rough on rats." In *Peaslee,* the defendant had prepared the physical conditions for setting fire to his house that needed only the act of lighting and applying a candle; the defendant was approaching the house with a man whom he had solicited to perform the act when he changed his mind and abandoned the enterprise. On an indictment that omitted reference to the solicitation, the case failed because the preparation was "too remote" to qualify as the overt act; had the solicitation been also alleged in the indictment, there might have been a case, but whether as an attempt or as merely a solicitation, the Reporter of Decisions in his headnote wrote "quaere." The passage, 177 Mass. at 274, is indeed elusive.

the act and the natural conditions present or supposed to be present are not enough to do the harm without a further act, but where it is so near to the result that if coupled with an intent to produce that result, the danger is very great." Holmes, J., dissenting in *Hyde* v. *United States*, 225 U.S. 347, 387 (1912) (contrasting criminal attempt with conspiracy).

Holmes's view concentrates attention on the distance or gap between the defendant's actions and the (unachieved) goal of the consummated crime — the distance must be relatively short, the gap narrow, if the defendant is to be held guilty of a criminal attempt.[10]

Overall, Holmes is concerned with the dangerousness of the actor's conduct as the key to criminal attempt. There is a contrasting position, adopted by the Model Penal Code, that the criterion should be the actor's dangerousness, his disposition to commit a crime.[11] But as the dangerousness of an individual who tries to commit a crime but does not succeed, equates or nearly so with the dangerousness of one who succeeds, the Code abandons a proximity-of-conduct standard and accepts less stringent signs of personal dangerousness to ground convictions for criminal attempt. So the Code dwells on what the actor did toward attaining the substantive offense rather than on what he had yet to do: the law should look to a "substantial step in a course of conduct planned to culminate in [the] commission of the crime," which step was "strongly corroborative of the actor's criminal purpose." Model Penal Code and Commentaries § 5.01(1)(c) & (2), Criminal Attempt (1985). The Code thus tends to broaden the base of criminal attempt, to make convictions easier to reach.

---

[10]In thinking about measuring the distance, so to speak, we are assisted by the remarks in the *Kennedy* case that "[e]very question of proximity must be determined by its own circumstances," and "the gravity of the crime, the uncertainty of the result, and the seriousness of the apprehension, coupled with the great harm likely to result from poison even if not enough to kill, would warrant holding the liability for an attempt to begin at a point more remote from the possibility of accomplishing what is expected than might be the case with lighter crimes." *Id.* at 22. See the reference to this passage in *Commonwealth* v. *Gosselin*, 365 Mass. 116, 121 (1974).

[11]See Model Penal Code and Commentaries § 5.01 comment, at 298 (1985); Robinson, Punishing Dangerousness: Cloaking Preventive Detention as Criminal Justice, 114 Harv. L. Rev. 1429, 1448 n.71 (2001).

The Code formula for criminal attempt, or an approach thereto, has been adopted by legislation in a number of States.[12] A change veering in the direction of the Code was proposed for the Commonwealth in 1972,[13] but, as noted in the attempt case, *Commonwealth* v. *Ortiz*, 408 Mass. 463, 472 (1990), the Legislature has not acted.[14]

4. *Application.* Prosecution and defense were content with the trial judge's instructions on criminal attempt. These consisted of Instruction 5.02 and Supplemental Instruction of the Model Jury Instructions (1995) promulgated for use in our District Court. The instructions are in accord with the authority in the Commonwealth on the dangerous-proximity proposition. Thus the judge charged, following Model Instruction 5.02, that the Commonwealth must prove beyond a reasonable doubt

> "[t]hat the defendant took an overt act toward committing the crime, which was part of carrying out the crime, and came reasonably close to actually carrying out the crime."

The judge described "overt act," following the Supplemental Instruction, as

> "some actual, outward, physical *action*, as opposed to mere talk or plans. It is not enough that someone just intends to commit a crime or talks about doing so.
>
> "The overt act must also be a real step toward *carrying*

---

[12]The variant views of criminal attempt in jurisdictions around the country appear from their definitions of overt act, see Model Penal Code and Commentaries § 5.01 comment, at 321-329 (1985); 2 LaFave & Scott, Substantive Criminal Law § 6.2(d), at 29-36 (1986).

[13]See Proposed Criminal Code of Massachusetts, part 6, Inchoate Offenses, c. 263, § 45, Criminal Attempt (1972).

[14]The foundational *Kennedy* and *Peaslee* cases have been regularly cited and respected. The court relies on these cases in the *Ortiz* decision, 408 Mass. at 470-472. That was a prosecution for attempted assault and battery by means of a dangerous weapon, which failed for want of proof of a cognizable overt act where the defendant and his brother got into a car with a gun fully loaded and drove about in search of their enemy without finding him. See *id.* at 464-465, 470-473, citing also *Commonwealth* v. *Gosselin*, 365 Mass. at 121; *Commonwealth* v. *Ware*, 375 Mass. 118, 120 (1978); *Commonwealth* v. *Foley*, 24 Mass. App. Ct. 114, 115 (1987). And see *United States* v. *Payne*, 966 F.2d 4, 9 (1st Cir. 1992).

*out* the crime. Preliminary preparations to commit a crime are not enough. The overt act has to be more of a step toward actually committing the crime, after all the preparations have been made. It must be the sort of act that you could reasonably expect to trigger a natural chain of events that will result in the crime, unless some outside factor intervenes." (Emphases in original.)

It is hardly necessary to say there was nothing in the conduct of the defendant or the officers synopsized above that could be found to reach the level of overt act as just defined. Contrast with the Model Penal Code is again instructive.[15]

We add that the interjection in attempt situations of solicitees who feign cooperation, as in the present case, does not alter the basic analysis.[16] The interjection means that consummation of the crime is "impossible." Impossibility in this sense is not in itself an answer to a charge of criminal attempt, for the defendant's intent is material. See 2 LaFave & Scott, Substantive Criminal Law § 6.3, at 42-44 (1986). But in the end the actual conduct of defendant and solicitees is assessed in relation to the envisaged crime according to usual theory.

We conclude that the judge erred in denying the defendant's motions for required findings on the indictments charging attempted murder.

5. *Solicitation.* The decision of *Commonwealth* v. *Barsell,* 424 Mass. 737 (1997), confirmed the existence in the Commonwealth of the common-law crime of solicitation to commit a felony, punishable as a misdemeanor. The court, at 738-739, referred to *Commonwealth* v. *Flagg,* 135 Mass. 545 (1883), which describes the crime thus: "It is an indictable offence at common law for one to counsel and solicit another to commit a felony or other aggravated offence, although the solicitation is

---

[15]As an example of "conduct that may be held [a] substantial step," § 5.01(2) of the Code lists (among other illustrative situations) "soliciting an innocent agent to engage in conduct constituting an element of the crime": if such conduct is "strongly corroborative of the actor's criminal purpose," it "shall not be held insufficient as a matter of law." Of course, such solicitation could not qualify under the District Court Model Instruction as the overt act in a prosecution for criminal attempt.

[16]Annot., 54 A.L.R. 3d 612, 666-672 (1973), cites such cases from other jurisdictions. These may be expected to reflect variant views of overt act, note 12, *supra.*

of no effect, and the crime counselled is not in fact committed." *Id.* at 549. See *Commonwealth* v. *Harrington*, 3 Pick. 26, 28-29 (1825); *Commonwealth* v. *Willard*, 22 Pick. 476, 477-479 (1839). The indictments herein charged that the defendant "did solicit, procure, request or demand."[17] The judge charged in the sense of the indictments and the parties were content. It is not doubted there was evidence to prove the offense beyond a reasonable doubt. The defendant asked the judge to add to the charge a requirement of "specific intent," but that was not an element of the common-law offense as marked out in our cases and accepted as law in *Barsell*. It appears that some statutes recently enacted, codifying the common-law offense, have used such words. We venture to say that a solicitation charge as at common law pretty well carries with it a notion of purpose to which language of specific intent would add little, if anything.[18] There was no error and the convictions for solicitation will stand.[19]

6. *Other points.* (a) In the course of the recorded telephone conversations, the defendant said he had grown and sold marijuana in the past and intended to go into the trade in a big-

---

[17]Perkins & Boyce, Criminal Law 647 (3d ed. 1982), states: "The word 'solicitation,' in the sense of 'criminal solicitation,' is employed in the law as a general label to cover any use of words or other device by which a person is requested, urged, advised, counseled, tempted, commanded or otherwise enticed or incited to commit a crime."

[18]In a recent case, close on its facts to the present, where a conviction of solicitation of murder was affirmed, the court rounded out the elements of solicitation as follows: "Conviction of the common-law crime of solicitation to commit murder requires proof that the defendant solicited, counseled, advised, or otherwise enticed another to commit murder and that the defendant intended that the person in fact commit the murder." *Commonwealth* v. *Lenahan*, 50 Mass. App. Ct. 180, 186 (2000).

[19]Were we affirming the convictions of attempted murder, we would have to deal with the defendant's claim of duplicitousness in the crimes of attempt and solicitation under the rule of *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871), reaffirmed by *Commonwealth* v. *Crocker*, 384 Mass. 353, 357-361 (1981). The Commonwealth responded in its brief by suggesting that *Morey* is met because solicitation requires proof of solicitation, but attempt does not, while attempt requires proof of an overt act, which solicitation does not. Without passing on the point, we note the Model Penal Code, as among charges of attempt, solicitation, and conspiracy for roughly the same episode, would allow conviction of but one of the offenses. See Code § 5.05(3). Comparable statutory provisions have been adopted in some States.

ger way when he was released. The defendant did not object to the admission of these avowals, but made a point of testifying that he knew about the marijuana field only its location. Where the defendant was offering access to the field because it had value and represented payment, his business experience with the drug seems not irrelevant, hence admissible. If there was error, surely there was no risk of a miscarriage of justice, *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), for the statements were a very minor fraction of the voluminous record, and as admissions about illegal drugs they were greatly overmatched by the defendant's convictions of record.

(b) The judge declined to admit testimony by the defendant or others regarding events preceding January, 1996, when the defendant surrendered after parole violation. The evidence sketchingly forecast was intended to assist in proving the defense claim of a frameup.[20] The judge could evaluate the offer in the light of the defendant's hypothesis of frameup and the evidence, such as it was, of happenings after the surrender, and conclude with reason, in her discretion, that the offer was so speculative and weak as to be merely diversionary. Even so, the judge did permit testimony about the earlier events intended to show the parole officer's alleged bias against the defendant. There was no error.

On the indictments charging criminal attempt, the judgments are reversed, the verdicts are set aside, and judgment is to be entered for the defendant. The judgments on the indictments charging solicitation are affirmed.

*So ordered.*

---

[20]To be distinguished was the defendant's suggestion of entrapment. The judge instructed on the point but the jury were not moved.