COMMONWEALTH *vs.* GEORGE PURRIER.

No. 00-P-1654.

Hampden. January 10, 2002. - April 8, 2002.

Present: BROWN, KASS, & KANTROWITZ, JJ.

*Assault by Means of a Dangerous Weapon. Practice, Criminal,* Argument by prosecutor.

A general verdict in a criminal case that had been tried on the theory that the jury could find proof of assault by means of a dangerous weapon either by an attempted battery or by putting another in fear of an immediately threatened battery did not create a substantial risk of a miscarriage of justice, so as to require reversal, where there was sufficient evidentiary support for the attempted battery theory as well as the immediately threatened battery theory. [400-403]

The prosecutor's comments during closing argument at a criminal trial may have exceeded the bounds of proper argument, but the remarks were not prejudicial in the context of the case, and did not create a substantial risk of a miscarriage of justice. [403-404]

INDICTMENTS found and returned in the Superior Court Department on September 23, 1999.

The cases were tried before *C. Brian McDonald,* J.

*Peter M. Onek,* Committee for Public Counsel Services, for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

BROWN, J. This appeal arises from the defendant's conviction by a jury in the Superior Court upon indictments charging him with assault and battery on Alibra Scott, and assault by means of a dangerous weapon, to wit: a knife (G. L. c. 265, § 15B[*b*]), on Phillip Williams.[1] The defendant claims on appeal that his conviction for assault with a dangerous weapon must be reversed because the Commonwealth's proof failed as to one of

_____

[1]The jury acquitted the defendant of armed robbery.

the two theories upon which the case was submitted to the jury, thus denying him a fair trial.[2] He also asserts that the prosecutor misstated the evidence during her summation.

Upon the jury's verdicts, we may take it that the facts were as follows. On June 9, 1999, the two victims, Scott and Williams, were engaged in sexual intercourse in Scott's residence at 14 Gunn Square in Springfield, when the defendant, the father of Scott's twins, let himself into the apartment with a key. Williams heard a door slam, and he turned and saw a man standing in the doorway. Scott exclaimed, "Oh my God, Oh my God." The light came on, and an argument commenced between Scott and the defendant with much yelling and commotion. The defendant, Williams testified on cross-examination, was "enraged" upon discovering the parties in bed. Williams could not understand much of what the defendant was yelling, but he was arguing with Scott, asking her, "[w]ho [was] this white guy," while simultaneously ordering Williams to leave. He stated that it "sounded like [the defendant] wanted to hurt [me]." Williams scrambled to get dressed, and he testified thus: "[w]e all started moving in positions around the room. It just — it looked like he was coming towards me." Williams observed that the defendant (whom he did not know) had a set of keys in his hand and that there was a knife attached to the keys.[3] The defendant opened the knife. The defendant "just kept [the knife] in his hand, walking back and forth around the room while we were positioning." When asked whether the defendant was walking toward him, Williams responded, "[h]e couldn't[,] with [Scott] in the way."

At some point, Williams stated, the defendant asked Williams for his wallet. Williams told him that there was nothing in it, and showed it to the defendant. With the knife still in his hand, the defendant reached around Scott to take the wallet from Williams. Williams then ran out of the room, followed by the defendant, and proceeded up the street where he encountered a

---

[2]The defendant makes no argument as to the validity of his conviction for assault and battery.

[3]Williams did not testify as to the type of knife the defendant had in his possession, nor did the police officer who arrested the defendant and found the object on his person. The defendant makes no argument on appeal with respect to whether or not the knife was properly characterized as a dangerous weapon.

police cruiser. While he was running, Williams turned to see if anyone was following him; he saw a person enter Scott's Honda automobile, which had been parked in front of the house. The police took Williams back to Scott's apartment, where he identified the defendant as the person who had assaulted him.

Scott, who may be described as a reluctant witness,[4] testified essentially as follows. The defendant had lived with her in the apartment, but was not "on the lease," and she had not had contact with him for about two weeks prior to the incident.[5] At about 1:00 A.M., while she was in bed with Williams, the defendant entered the apartment using a key. When he discovered the parties, the defendant "[s]tarted screaming, shouting, throwing stuff," and ordered the two to get dressed. After entering the room, the defendant went to the foot of the bed and opened the knife that was attached to his keys. Williams was hopping about attempting to get dressed. As the defendant "stepped closer" to Williams, Scott got between them, whereupon the defendant punched her in the mouth.[6] Williams quickly got dressed, jumped over the bed, and went out the door. The defendant went "[r]ight after him." Scott testified, however, that when he departed, the defendant did not have the knife with him; it had fallen to the floor. According to Scott, the defendant had later retrieved the keys and knife when he returned to the apartment with his girlfriend, looking for Williams.

Officer Juan Rosario of the Springfield police department testified that at about 1:15 A.M., Williams, who was "sweating profusely, and . . . gasping for air" (he had been running), got in the way of his cruiser at the corner of Wilbraham Road and Westford Avenue. Williams told Rosario that he had been over

---

[4]The judge issued a capias warrant for both Scott and Williams when they did not appear on the first morning of trial. Scott gave the police a written statement on June 16, 1999, but about a month later, she gave a different statement to the defendant's trial counsel. At trial she testified that she had hoped that the charges would be dropped. Scott acknowledged that some of her statements to defense counsel were not true.

[5]On cross-examination, Scott testified that the defendant had been living with her for the "previous seven months or so."

[6]This conduct formed the basis for the assault and battery indictment, which the defendant is not challenging on appeal.

to his "girlfriend's house," and was having sex when the defendant "barged in," and "started hitting . . . [Scott] and then "pulled a knife and started to attack [Williams]." Williams was taken back to 14 Gunn Square, and the officer observed a female on the front porch, "angry [and] upset," and talking "loud [and] fast." Her face had red marks. Scott told the police "the same thing" Williams had recounted, and told them where they could likely find the defendant. The officers went to the address and observed the defendant about to enter a white Honda Accord. The defendant was told that he would be brought back to Scott's residence. A search of his person produced a "knife connected to his key chain."

1. *Sufficiency of the attempted battery theory.* The case was tried on the theory that the jury could find proof of assault with a dangerous weapon in one of two ways: either by an attempted battery, or by putting another in fear of an immediately threatened battery, the "oldest conception [under the common law, being] an attempted but unaccomplished battery without regard to whether the victim was put in fear."[7] *Commonwealth* v. *Richards*, 363 Mass. 299, 303 (1973). See *Commonwealth* v. *Musgrave*, 38 Mass. App. Ct. 519, 521 (1995), *S.C.* 421 Mass. 610 (1996). Frequently added to the definition of an attempted battery are the words, "coupled with a present ability and present intention" to consummate the battery. *Commonwealth* v. *Slaney*, 345 Mass. 135, 138 (1962). The jury were duly instructed on the alternative theories of the crime, and on present ability, although no special verdict slips went to the jury room. The defendant concedes that the jury could have concluded beyond a reasonable doubt that there was evidence to support the "immediately threatened battery" formulation.

The defendant contends that there was a failure of proof as to the attempted battery theory, and that because the jury returned a general verdict, it was impossible to know whether they convicted the defendant on a theory for which there was not

---

[7]At common law, assault had two meanings. A criminal assault was an attempt to commit a battery. A tortious assault was an act that put another in reasonable apprehension of immediate bodily harm. Both concepts are now recognized as criminal assaults. See Perkins & Boyce, Criminal Law 159-162 (3d ed. 1982).

legally sufficient evidence; therefore, on this view, the conviction for assault with a dangerous weapon must be reversed. See *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988).

As to attempted battery, it is established that the defendant must undertake "some overt step towards accomplishing [a harmful or an unpermitted touching] and [that he] came reasonably close to doing so." Model Jury Instructions for Use in the District Court § 5.402 (1997). See *Commonwealth* v. *Dixon*, 34 Mass. App. Ct. 653, 655 (1993) (elements of an attempted crime consist, in part, of "some overt act towards its commission, and failure or interruption"). Put somewhat differently, the evidence must establish that the defendant's conduct "approach[ed] the achievement of the substantive crime attempted near enough to warrant criminal liability in view of such circumstances as the gravity of the crime, the uncertainty of the result, and the seriousness of any threatened danger." *Commonwealth* v. *Gosselin*, 365 Mass. 116, 121 (1974).[8] It is immaterial whether or not the victim was put in fear. *Commonwealth* v. *Richards*, *supra*.

Cases involving the immediately threatened battery theory of the crime of assault with a dangerous weapon are legion. See, e.g., *Commonwealth* v. *Swahn*, 5 Mass. App. Ct. 642, 645 (1977); *Commonwealth* v. *Musgrave*, *supra* at 523. On the other hand, we must turn for the most part to the general attempt statute (G. L. c. 274, § 6), see *Commonwealth* v. *Ortiz*, 408 Mass. 463, 470 (1990); *Commonwealth* v. *Hamel*, 52 Mass. App. Ct. 250, 256-260 (2001), or to cases involving lesser included offenses, see *Commonwealth* v. *Dixon*, 34 Mass. App. Ct. 653, 654-657 (1993); *Commonwealth* v. *Murray*, 51 Mass. App. Ct. 57, 61-62 (2001), for a discussion of the crime of

---

[8]Justice Holmes put it this way: "the act done must come pretty near to accomplishing [the crime] before the law will notice it." *Commonwealth* v. *Kennedy*, 170 Mass. 18, 20 (1897). In a recent case decided by this court, *Commonwealth* v. *Hamel*, 52 Mass. App. Ct. 250, 256-257 (2001), holding that the case for attempted murder was not made out because there were "no acts . . . that came close to or formed part of any physical perpetration of any murders," the opinion, summarizing the Holmes position as articulated in the *Kennedy* case, and the subsequent decision in *Commonwealth* v. *Peaslee*, 177 Mass. 267 (1901), recites that "what the actor in fact did toward fulfilling the intention must have been dangerously close to the consummation of the object crime to serve as the crucial overt act."

attempts. What we glean from a perusal of available authorities is that precisely what kind of overt act is required to establish criminal liability for an attempted battery is simply not subject to the application of bright line rules, but rather is a question of fact for the jury, and must be determined on a case-by-case basis. See, e.g., *Commonwealth* v. *Harney*, 10 Met. 422, 427 (1845) ("Whether the acts done by the defendant were such as to authorize the jury to find an attempt . . . was wholly a matter for the jury, as it was properly left to them").

The Commonwealth relies on *Commonwealth* v. *Gorassi*, 432 Mass. 244, 250 (2000). In that case, the court concluded that there was sufficient evidence introduced that the defendant falsely enticed the victim into the crafts room of a public library and that he attempted a battery (kidnapping); more particularly, the evidence was "that the girl had her back to the wall, that the defendant was a few inches from her and was reaching toward her," from which it was inferable that he intended to kidnap her. *Ibid.* We think that the present facts are sufficiently comparable to those found in the *Gorassi* case to enable us to reach the conclusion that the case properly went to the jury on both theories of assault.

Here, there was evidence from both Williams and Scott that at some point during the episode the defendant, holding the knife in an open position, moved in the direction of Williams, and but for the intervention of Scott, who positioned herself between the two men, came close to the commission of a battery. Indeed, there was evidence that the defendant reached around behind Scott to where Williams was standing; it would appear not to matter whether his intent was merely to retrieve Williams's wallet, because what is at stake is the "dangerousness of the actor's conduct." *Commonwealth* v. *Hamel, supra* at 258. It may be inferred that the defendant came within inches of Williams when reaching for the wallet with the knife still in his hand; ipso facto, he had the apparent ability to commit, and came close to the commission of, a battery. Indeed, he was near enough to strike. In the words of one commentator the facts made out "the commencement of the consummation." LaFave & Scott, Criminal Law § 6.2(d), at 504 (2d ed. 1986). Moreover, the defendant's emotions were charged enough to

have resulted in the immediately preceding commission of a battery upon Scott, who, the jury found, was punched in the mouth when she attempted to intervene.

In sum, the evidence and reasonable inferences drawn therefrom, consisting of the defendant's obvious anger, his display of the knife, his approach toward Williams (described by Scott as the act of "stepp[ing] closer" to Williams), and his subsequent conduct in reaching around Scott and toward Williams with one of his hands (unspecified), while holding the opened knife, constitutes, in our opinion, sufficient evidentiary support for the attempted battery theory. There was no substantial risk of a miscarriage of justice. See *Commonwealth v. Ramos*, 47 Mass. App. Ct. 792, 798-799 (1999).

2. *Closing argument.* For the first time on appeal, the defendant complains of certain misstatements made by the prosecutor in her summation: (a) "this man [the defendant] was standing in the room, in a rage, waving the knife around"; (b) in reference to testimony by Williams, "that [he] said [the defendant] had the knife in his hand when he was chasing [Williams] out of the house"; and (c) "I think the average person expects the police to take seriously a person who's being chased down the street with a knife."

As no objection was raised to the prosecutor's remarks, we confine our review to whether, if error, a substantial risk of a miscarriage of justice has occurred. *Commonwealth v. Cyr*, 433 Mass. 617, 626 (2001). Prosecutors have a duty to "argue the Commonwealth's case . . . in a way that states the evidence clearly and fairly." *Commonwealth v. Santiago*, 425 Mass. 491, 494 (1997). See *Commonwealth v. Kozec*, 399 Mass. 514, 516 (1987) (the prosecutor may not misstate the evidence or refer to facts not in evidence). A prosecutor, however, may argue fair inferences that might be drawn from the evidence. *Commonwealth v. Murchison*, 418 Mass. 58, 59 (1994).

Here, the prosecutor's comments may have exceeded the bounds of proper argument. There was no testimony that the defendant was "waving" the knife during the episode in the apartment (the Commonwealth concedes that this was not "technically testified to by any witness," but argues that it was an allowable inference from the evidence); nor was there

testimony that the defendant chased Williams out of the apartment with a knife (Scott testified that the knife was on the floor when the defendant left the premises, and Williams saw a man enter the Honda as he was running down the street but did not identify him as the defendant).

We conclude, however, that the remarks in question were not prejudicial in the context of the case, and therefore did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Tuitt*, 393 Mass. 801, 811 (1985). See also *Commonwealth* v. *Picher*, 46 Mass. App. Ct. 409, 415 (1999). Even though the comments pertaining to what occurred on the street (as opposed to what occurred in the apartment) may have crossed the line of impropriety, they could not have harmed the defendant, as there was, in our view, ample evidence concerning the events inside the apartment to satisfy the attempted battery theory. That leaves the reference to the "waving" of the knife. This was no more than mere verbal embellishment and likely caused no damage. In the first place, the jury were discriminating in acquitting the defendant of the most serious of the indictments against him, armed robbery. *Commonwealth* v. *Kozec, supra* at 517. In addition, the deliberating jury sent three questions to the judge seeking clarification with respect to the assault by means of a dangerous weapon charge. This, we think, demonstrates that they were determined to do their job in a conscientious manner uninfluenced by any hyperbole from the prosecutor. We are confident that if the statements had not been made, the jury's verdicts would have been the same.

*Judgments affirmed.*